# CONGRESSIONAL BUDGET OFFICE
# COST ESTIMATE

December 8, 2003

## H.R. 2297
### Veterans Benefits Act of 2003

*As cleared by the Congress on November 20, 2003*

## SUMMARY

H.R. 2297, the Veterans Benefits Act of 2003, contains provisions that would affect several veterans programs, including housing, education, compensation, pensions, and burial. CBO estimates this legislation would reduce direct spending for veterans programs by $77 million in 2004, $1 million over the 2004-2008 period, and about $6 million over the 2004-2013 period. The act would not affect revenues.

## ESTIMATED COST TO THE FEDERAL GOVERNMENT

CBO's estimate of the budgetary effects of provisions that would affect direct spending is shown in Table 1. The effects on direct spending fall under budget functions 050 (national defense), 600 (income security), and 700 (veterans benefits and services). This estimate incorporates the effects of H.R. 1683, the Veterans' Compensation Cost-of-Living Adjustment Act of 2003, as cleared by the Congress on November 21, 2003.

TABLE 1. SUMMARY OF H.R. 2297'S EFFECTS ON DIRECT SPENDING

| | By Fiscal Year, in Millions of Dollars | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Changes in outlays[a] | -77 | 6 | 21 | 30 | 19 | 25 | 16 | 14 | -27 | -36 |

a. The 10-year costs in the text differ slightly from the sum of the annual costs listed here because of rounding.

## BASIS OF ESTIMATE

H.R. 2297 contains provisions that would affect direct spending in veterans' programs for housing, compensation, pension, burial, and veterans' readjustment benefits. Table 2 summarizes those effects, and the individual provisions that would affect direct spending are described below. In total, CBO estimates this legislation would decrease direct spending for veterans' programs by $77 million in 2004, $1 million over the 2004-2008 period, and about $6 million over the 2004-2013 period.

TABLE 2. IMPACT OF H.R. 2297 ON DIRECT SPENDING, BY MAJOR COMPONENT

| | By Fiscal Year, Outlays in Millions of Dollars | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| **CHANGES IN DIRECT SPENDING** | | | | | | | | | | |
| Veterans' Housing | -118 | -79 | -69 | -72 | -76 | -78 | -84 | -88 | -113 | -107 |
| Readjustment Benefits | 17 | 50 | 56 | 57 | 58 | 60 | 60 | 60 | 60 | 61 |
| Compensation, Pension, and Burial Benefits[a] | 23 | 36 | 37 | 49 | 41 | 47 | 44 | 46 | 31 | 15 |
| Retirement Benefits | 1 | -1 | -3 | -4 | -4 | -4 | -4 | -4 | -5 | -5 |
| Total[a] | -77 | 6 | 21 | 30 | 19 | 25 | 16 | 14 | -27 | -36 |

### Housing

Four sections of the act would affect direct spending for veterans' housing programs. Together, CBO estimates that these provisions would lower direct spending by $118 million in 2004, $414 million over the 2004-2008 period, and $884 million over the 2004-2013 period. (Higher savings in 2004 result from lower interest rate assumptions for that year compared to those projected for the 2005-2013 period.) In preparing this estimate, CBO accounted for the interactive effects between the individual provisions. Costs or savings for each individual provision, estimated as if they were enacted alone, are described below.

**Reinstatement of Vendee Home Loan Program.** Section 404 would reinstate the vendee home loan program which was discontinued by the Department of Veterans Affairs (VA) on January 31, 2003. Before that date, when a veteran defaulted on his mortgage and the home went into foreclosure, VA often acquired the property and issued a new direct loan when the property was sold. These loans are called vendee loans. CBO estimates that reinstating the program would save VA $357 million over the 2004-2013 period, or roughly $35 million a year. The act also would require VA to finance between 50 percent and 85 percent of such

sales through the vendee loan program. Before the program was terminated, VA financed roughly 60 percent of such sales with vendee financing and CBO estimates that it would continue to do so under the act. The estimated savings for this provision is the net effect of three individual program effects (two with savings and one with costs), as explained below.

Based on historical data, CBO estimates that under the act roughly 14,000 vendee loans would be made each year with an average loan amount of $98,000. Vendee loans lower the subsidy cost of the VA home loan program in two ways. First, VA receives more money for homes sold with vendee financing than those sold with other financing (16 percent more in 2002). Since the proceeds from these home sales are considered recoveries of losses from the guaranteed loans that were foreclosed, this section would increase recoveries and therefore lower subsidy costs in the guaranteed loan portfolio. CBO estimates that VA would save an average of $68 million a year in guaranteed loan subsidies over the 2004-2013 period. Second, because vendee loans have lower prepayment and default rates than other direct loans made by VA, this provision also would lower subsidy costs for direct loans by an average of $28 million a year over the 2004-2013 period. Finally, before the program was terminated in 2003, VA sold most vendee loans on the secondary mortgage market and guaranteed their timely repayment; CBO estimates that it would continue to do so under the act. Based on historical data, CBO estimates that VA would sell an average of $1.2 billion in vendee loans annually, at a subsidy cost of roughly $60 million a year.

**Changes in Loan Fees.** Section 405 would make several significant changes to the fees charged for the VA home loan guarantee. First, veterans of selected-reserve service would pay loan fees that are 25 basis points higher than fees paid by veterans with active-duty service; under current law veterans who served in the selected reserves pay 75 basis points more than veterans with active-duty service. Second, the act would increase the fee charged for loans made with no down payment. In 2004 veterans would pay 20 basis points more, and over the 2005-2013 period they would pay 15 basis points more. Third, the provision would increase the fee charged for repeated use of the home loan benefit (when a veteran uses the benefit more than once) by 30 basis points for the 2004-2011 period and by 90 basis points in 2012 and 2013. CBO estimates that revising fees in the manner specified above would reduce direct spending by $53 million in 2004 and $548 million over the 2004-2013 period.

**Home Loans for Reservists.** Section 403 would permanently extend the home loan benefits guaranteed by VA to members of the selected reserve. Under current law, reservists are eligible for home loans guaranteed by VA through 2009. CBO estimates that under the act, VA would guarantee 9,000 additional loans a year over the 2010-2013 period, with an average loan amount of $153,000. CBO further estimates that the subsidy cost associated with these additional loans would total $10 million over the 2010-2013 period.

**Resale Losses.** Section 406 would extend for one year, through 2012, a provision of law that requires VA to consider losses it might incur when selling a property acquired through foreclosure. Under current law, VA follows a formula defined in statute to decide whether to acquire the property or pay off the loan guarantee instead. The formula requires appraisals that might be valid at the time they are made, but does not account for changes in market conditions that might occur while VA prepares to dispose of the property. The act would extend the requirement for VA to take account of losses from changes in housing prices that the appraisal does not capture. Losses of this type might be prevalent when housing prices are particularly volatile or if appraisals are biased for other reasons. CBO estimates this provision would save $10 million in 2012.

## Veterans' Readjustment Benefits

Several sections of the act would affect direct spending for veterans' readjustment benefits (see Table 3). Together, those provisions would increase spending by $17 million in 2004, $238 million over the 2004-2008 period, and $539 million over the 2004-2013 period, CBO estimates.

**Survivors' and Dependents' Education Assistance.** Effective July 1, 2004, section 302 would increase the survivors' and dependents' education benefit to $788 a month, an increase of 13 percent over the current rate. Based on our analysis of the effects of previous benefit increases, CBO assumes this hike in the benefit level would increase the number of beneficiaries from an average of 53,000 a year over the 2004-2013 period to 54,000, and would enable more of these students to attend school full time rather than part time. CBO estimates this provision would increase direct spending for readjustment benefits by $10 million in 2004, $211 million over the 2004-2008 period, and $516 million over the 2004-2013 period.

TABLE 3. IMPACT OF H.R. 2297 ON VETERANS' READJUSTMENT BENEFITS

| Description of Provisions | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|
| | By Fiscal Year, in Millions of Dollars | | | | | | | | | |
| Survivors' and Dependents' Education Assistance | 10 | 43 | 50 | 53 | 55 | 57 | 59 | 61 | 63 | 65 |
| Education COLAs | 0 | -1 | -2 | -4 | -6 | -7 | -9 | -11 | -13 | -14 |
| Automobile and Adaptive Equipment Grants | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 |
| Adaptive Housing Grants | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| MGIB for Self-Employment Training | 1 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 |
| Entrepreneurship Courses | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Total Changes in Veterans' Readjustment Benefits | 17 | 50 | 56 | 57 | 58 | 60 | 60 | 60 | 60 | 61 |

NOTES: MGIB = Montgomery GI Bill; COLA = Cost-of-Living Adjustment.

**Education Cost-of-Living Adjustments (COLAs).** Section 304 would reduce direct spending for education benefits by changing the method for calculating the monthly stipends paid under the Montgomery GI Bill (MGIB) and Survivors' and Dependents' Education Assistance programs. Under current law, the benefit amounts are rounded to the nearest dollar. Under section 304, after calculating the annual COLA increase, the monthly rates would each be rounded down to the next lower whole dollar. There would be no savings in 2004, as the benefit rates for this year have already been set. Starting with the COLA in fiscal year 2014, the calculation would revert to the current method. Based on our projections of the number of beneficiaries and the number of payments made each year, CBO estimates that this section would result in direct spending savings of $13 million over the 2005-2008 period and $67 million over the 2005-2013 period.

**Automobile and Adaptive Equipment Grants.** Section 402 would increase a benefit that helps eligible disabled veterans obtain suitable transportation. CBO estimates this provision would increase direct spending for automobile grants and adaptive equipment by about $4 million in 2004, $21 million over the 2004-2008 period, and $46 million over the 2004-2013 period.

*Automobile Grants.* Section 402 would increase, from $9,000 to $11,000, the maximum amount of a grant available to eligible veterans for the purchase of an automobile or other vehicle. Veterans are eligible to receive this grant if, as a result of a service-connected injury

or disease, they have lost the use of one or both hands (or feet), or have a severe vision impairment.

Based on data provided by VA, CBO estimates that about 1,100 veterans purchased automobiles in 2002 with the help of VA grants that averaged almost $9,000. Based on our analysis of the results of previous increases in this grant amount, CBO estimates that increasing the maximum grant amount to $11,000 would raise the number of grants awarded to about 1,220, an increase of about 120 grants a year. Thus, CBO estimates that this provision would increase outlays for automobile grants by about $3 million in 2004, $16 million over the 2004-2008 period, and $36 million over the 2004-2013 period.

*Adaptive Equipment.* Veterans who receive automobile grants under the VA program are also entitled to receive the necessary adaptive equipment to enable them to safely operate their vehicles, and to have that equipment repaired or replaced as necessary. Based on current levels of expenditure, we estimate that providing adaptive equipment for about 120 extra vehicles a year would increase annual outlays by about $700,000, and that outlays would increase by close to $1 million a year in later years as these additional vehicles begin to return for repair or replacement of equipment. Thus, CBO estimates that providing and maintaining adaptive equipment for the extra vehicles purchased as a result of the benefit increase for automobile grants under section 402 would increase direct spending by about $1 million in 2004, $5 million over the 2004-2008 period, and $10 million over the 2004-2013 period.

**Adaptive Housing Grants.** VA currently administers two grant programs to assist severely disabled veterans in acquiring housing that is adapted to their disabilities, or in modifying their existing housing. Under current law, veterans who are classified by VA as totally disabled and who have certain mobility limitations are entitled to receive housing grants of up to $48,000. Totally disabled veterans who are blind or have lost the use of their hands are entitled to receive grants of up to $9,250. Section 402 also would increase those grants to maximums of $50,000 and $10,000, respectively.

According to VA, 678 veterans received housing grants averaging $36,586 in fiscal year 2002. Because the benefit increase is relatively small, and the criteria to receive these grants are highly restrictive, CBO expects that this provision would not result in a significant increase in the number of grants that would be awarded each year. CBO estimates that, under this provision, the grants would average slightly less than $40,000, increasing direct spending by about $1 million annually.

**Montgomery GI Bill for Self-Employment Training.** Section 301 would allow veterans to use their education benefits to receive on-the-job training for periods of less than six

months, when that training is needed to obtain a license to engage in a self-employment occupation or is required for ownership and operation of a franchise. This provision would take effect six months after enactment. Under current law, these benefits are usually approved only for those on-the-job training programs that last a minimum of six months. Based on information from VA, CBO believes this expansion of education benefits would be used primarily by those seeking to own and operate a franchise. Franchise companies typically require prospective owners to undergo a four-to-six week program of on-the-job training.

Based on information from the Department of Labor, CBO estimates that about 6,500 eligible veterans took self-employment classes through Small Business Development Centers (SBDCs) in 2002, and we assume that about 1,600 of these also completed an average of five weeks of on-the-job training that is associated with the purchase of a franchise. Because the population eligible for and using MGIB is growing, we estimate this number will increase to about 2,000 by 2013. In 2004, the MGIB benefit will be $985 a month, or about $1,200 for a five-week period. Under current law, such payments are annually adjusted for increases in the cost of living. Thus, CBO estimates that section 301 would increase direct spending for veterans' education benefits by $1 million in 2004, $9 million over the 2004-2008 period, and $24 million over the 2004-2013 period.

**Entrepreneurship Courses.** Section 305 would allow eligible veterans, survivors, and dependents to receive education benefits for entrepreneurship courses offered by a Small Business Development Center or by the National Veterans Business Development Corporation, also known as The Veterans Corporation.

According to the Small Business Administration, 17,581 veterans received training from SBDCs in fiscal year 2001. The SBDCs offer a number of courses for individuals who own or are interested in starting a small business, generally at little or no cost. Based on analysis of the available courses and tuition, CBO estimates that about 3,000 veterans, survivors, and dependents who are eligible for veterans' education benefits would each take three courses a year with an average tuition of $45 each, and that the tuition would increase with inflation.

The Congress established The Veterans Corporation, a federally chartered corporation tasked to assist veterans with the formation and expansion of small business concerns, in the Veterans Entrepreneurship and Small Business Development Act of 1999 (Public Law 106-50). The Veterans Corporation began offering entrepreneurship classes to veterans this year, and they intend to enroll 1,500 veterans in 2004 and 3,000 veterans in 2005. Tuition for the course is currently $350, and CBO expects it will increase with inflation to about $445 by 2013. Because education benefits usually expire 10 years after separating from military

service, CBO expects that less than half of these students would be eligible for veterans' education benefits.

Taken together, CBO expects that, under section 305, the SBDCs and The Veterans Corporation would train about 5,000 veterans, survivors and dependents a year who are eligible for education benefits from the VA. We estimate the annual cost for this training would be about $1 million.

**Other Provisions Affecting Spending for Readjustment Benefits.** The following provisions would have an insignificant budgetary impact on direct spending for readjustment benefits:

- Section 303 would extend the period of eligibility for survivors and dependents education benefits for those members of the National Guard who are involuntarily ordered to full-time National Guard duty under section 502(f) of title 32 of the U.S. Code. This expanded eligibility would be retroactive to September 11, 2001.

- Section 306 would repeal the Education Loan Program and forgive any remaining debts owed to the fund.

- Section 401 would allow severely disabled members of the armed forces to receive specially adapted housing grants from VA while still on active duty.

**Compensation, Pensions, and Burial Benefits**

Several sections of the act would affect spending for veterans' disability compensation, pensions, and burial benefits (see Table 4). Together, those provisions would increase spending by $23 million in 2004, $187 million over the 2004-2008 period, and $373 million over the 2004-2013 period, CBO estimates.

**Retention of Death and Indemnity Compensation (DIC) for Remarried Spouses.** Under current law, VA provides DIC payments to the surviving spouse of certain deceased veterans. If a surviving spouse remarries, DIC payments cease. Should the subsequent marriage end, either due to divorce or death of the new spouse, DIC payments can resume. Section 101 would allow a surviving spouse who remarries after age 57 to continue receiving DIC payments. The provision would apply retroactively, allowing surviving spouses who have already remarried after age 57 to resume receiving DIC payments but only if they apply for the benefit within one year after the date of the legislation's enactment. CBO estimates that the total cost to provide DIC payments to surviving spouses who remarry after age 57 would

be $18 million in 2004, $149 million over the 2004-2008 period, and $342 million over the 2004-2013 period. Some of these costs would be offset by direct spending savings in retirement programs for the uniformed services. Those savings are discussed in the section titled "Retirement Benefits" below.

TABLE 4. IMPACT OF H.R. 2297 ON VETERANS' COMPENSATION, PENSIONS, AND BURIAL BENEFITS

| | By Fiscal Year, Outlays in Millions of Dollars | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Description of Provisions | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Retention of DIC for Remarried Spouses | 18 | 31 | 32 | 33 | 35 | 36 | 37 | 39 | 40 | 42 |
| Extension of COLA Round Down | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -16 | -34 |
| Disability Benefits for Filipino Veterans | 4 | 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 |
| Alternate Beneficiaries | 0 | 0 | 0 | 11 | 1 | 6 | 1 | 1 | 1 | 1 |
| Repeal of Limitation on Payment of Accrued Benefits | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Burial Plot Allowance | * | * | * | * | * | * | * | * | * | * |
| Spina Bifida Benefits | * | * | * | * | * | * | * | * | * | * |
| Disability Benefits for Former POWs | * | * | * | * | * | * | * | * | * | * |
| Total Changes in Compensation, Pensions, and Burial Benefits [a] | 23 | 36 | 37 | 49 | 41 | 47 | 44 | 46 | 31 | 15 |

NOTES: DIC = Death and Indemnity Compensation, COLA = Cost-of-Living Adjustment, POWs = Prisoners of War.

* = less than $500,000.

In fiscal year 2002, about 300,000 surviving spouses received DIC payments. CBO estimates that in that year, about 300 surviving spouses over age 57 (or about 0.1 percent of all surviving spouses receiving DIC) remarried and stopped receiving DIC payments as a result. CBO projects that, under current law, the number of remarriages would gradually increase each year as the overall population of DIC recipients increases and exceed 370 a year by the end of the decade.

CBO estimated the costs for three groups of surviving spouses—those over age 57 who would remarry under current law, those over age 57 who would choose not to remarry under current law but would remarry once section 101 becomes law, and those who remarried after age 57 before enactment of this legislation.

*Surviving Spouses over Age 57 Who Would Remarry under Current Law.* CBO estimates that over the 2004-2013 period, about 350 surviving spouses over age 57 would remarry each year on average under current law. Under this act, federal spending for DIC would increase

because those surviving spouses would now receive DIC payments that would have stopped under current law. The average DIC payment in fiscal year 2002 was $12,244. Such payments are adjusted annually for increases in the cost of living. After accounting for expected mortality of the remarried surviving spouses as well as their new spouses, CBO estimates that the additional cost to provide DIC payments to surviving spouses over age 57 who would remarry under current law would be $6 million in 2004, $63 million over the 2004-2008 period, and $205 million over the 2003-2012 period.

*Surviving Spouses over Age 57 Who Would Choose Not to Remarry under Current Law.* Under this act, some surviving spouses over age 57 might choose to remarry who would not have done so under current law. CBO estimates there would be no additional cost to provide DIC payments to those individuals. Because those surviving spouses would choose to remain unmarried and receive DIC payments continuously under current law, providing DIC payments if they remarry would result in no additional costs to the program.

*Surviving Spouses Who Remarried after Age 57 Before Enactment of the Act.* Section 101 also would apply retroactively, allowing surviving spouses who remarried after age 57 before enactment of this legislation to resume receiving DIC once it is enacted. The act would impose a deadline, however, that would require all those eligible to apply for resumption of this benefit within one year after the act's enactment date. After accounting for expected mortality of the remarried surviving spouses as well as their new spouses, CBO estimates that about 1,900 surviving spouses who remarried after age 57 would apply within the time limit and resume receiving DIC payments. That number represents about 15 percent of the total number of retroactive cases that CBO estimates would be eligible to reapply for DIC payments. CBO estimates that the additional cost to provide DIC payments to this population would be $12 million in 2004, $86 million over the 2004-2008 period, and $137 million over the 2004-2013 period. Such costs could obviously be much higher or lower, depending on the portion of eligible people that apply for this retroactive benefit.

**Extension of Provision to Round Down COLA.** Section 706 would extend through 2013 a provision of law that requires the increased monthly rates due to the COLA to be rounded down to the next lower whole dollar. This provision of law applies to both disability compensation and dependency and indemnity compensation payments. These provisions are currently due to expire at the end of 2011. Based on projections of the number of beneficiaries and number of payments made each year, CBO estimates that this section would result in direct spending savings of $50 million over the 2012-2013 period.

**Disability Benefits for Filipino Veterans.** Section 211 would expand benefits for Filipino veterans who served in the Philippine Commonwealth Army or the New Philippine Scouts,

and their survivors. In sum, CBO estimates that section 211 would cost $4 million in 2004, $20 million over the 2004-2008 period, and $44 million over the 2004-2013 period.

*Dependency and Indemnity Compensation.* Under current law, surviving spouses and dependents of Filipino veterans who served in the Philippine Commonwealth Army or the New Philippine Scouts during World War II and live in the United States are eligible to receive half the amount of the DIC payment that survivors of veterans of the U.S. armed forces receive. Section 211 of the act would require that these survivors be paid at the full DIC rate.

Based on information provided by VA, CBO estimates that about 420 survivors of Filipino veterans who served in the Philippine Commonwealth Army or the New Philippine Scouts currently receive DIC payments at the 50 percent rate and that about 120 additional survivors would become eligible for these payments over the 2004-2013 period. CBO assumes that the survivors of these Filipino veterans received about half of the average DIC payment in fiscal year 2002 ($12,244, as noted above). After adjusting for cost-of-living increases, CBO estimates that, under the act, the average DIC payment to these survivors would be $15,144 for 2004, an increase of $7,572. After accounting for the expected mortality of these veterans and their eligible survivors, CBO estimates that this provision would raise direct spending for DIC by about $3 million in 2004, $18 million over the 2004-2008 period, and about $40 million over the 2004-2013 period.

*Disability Compensation Benefits.* Under current law, former New Philippine Scouts residing in the United States are eligible to receive half the amount of disability compensation currently available to veterans of the U.S. armed forces. Section 211 would increase disability compensation for these veterans to the full rate. Based on information provided by VA, CBO estimates that there are currently about 100 former New Philippine Scouts residing in the United States today. In fiscal year 2002, the average disability compensation payment was $7,334. CBO assumes that eligible former New Philippine Scouts received about half that amount. After adjusting for cost-of-living increases, CBO estimates that the average disability compensation payment to these veterans would total $8,526 for fiscal year 2004, an increase of $4,263. After accounting for expected mortality rates, CBO estimates that this provision would increase direct spending for veterans' disability compensation by less than $500,000 in 2004, about $2 million over the 2004-2008 period, and about $3 million over the 2004-2013 period.

**Alternate Beneficiaries.** Section 103 would allow payments of proceeds to alternate beneficiaries of certain VA life insurance policies. U.S. Government Life Insurance (USGLI) and National Service Life Insurance (NSLI) are programs that were established during World War I and World War II to provide life insurance coverage to servicemembers,

many of whom could not afford the high premiums associated with commercial policies. Under current law, there is no time limitation within which a named beneficiary is required to file a claim. Because these policies are old, VA sometimes has great difficulty finding the individuals to whom the proceeds should be paid. Moreover, an alternate beneficiary cannot be paid unless VA determines that the principal beneficiary died before the policyholder. VA is required to hold the unclaimed funds indefinitely as a liability to honor any possible future claims.

Section 103 would allow VA to pay USGLI or NSLI proceeds to a named alternate beneficiary if the principal beneficiary has not made a claim within two years after the death of the policyholder or October 1, 2004, whichever is later. If no claim has been made by any named beneficiary within four years of the policyholder's death or the legislation's enactment date, the VA may pay the proceeds to any person deemed entitled to the funds.

VA estimates there are currently about 4,000 policies with no locatable primary beneficiary. The department also predicts that an additional 200 policies will require settlement each year where the primary beneficiaries cannot be found. According to VA, the current policies have an average face value of $5,750 and new policies would have an average face value of $9,600. CBO assumes that VA will be able to find another beneficiary for two-thirds of the policies and that two-thirds of these will be paid after two years with the other third paid after four years. CBO estimates section 103 would raise direct spending for USGLI and NSLI by $11 million in 2007, $12 million over the 2007-2008 period, and $22 million over the 2007-2013 period.

**Repeal of Limitation on Payment of Accrued Benefits.** Under current law, when an individual applies for benefits administered by VA, any benefits that are awarded are paid retroactive to the date of application. If the applicant dies before receiving his or her retroactive benefits, certain survivors can apply to receive up to two years' worth of the unpaid benefits. VA refers to these benefits that are due but unpaid to deceased applicants as "accrued benefits."

Before December 2002, VA applied the two-year limit on accrued benefits to all cases in which the applicant died before receiving payment. On December 10, 2002, the U.S. Court of Appeals for Veterans Claims (CAVC) decided in *Bonny v. Principi* that the two-year limit applies differently to the following two groups:

- Applicants who die before VA makes the final decision on the application, and
- Applicants who die after VA makes the final decision on the application but before receiving payment.

CAVC ruled that if the applicant dies before receiving payment but after VA approves the claim, eligible survivors should receive the entire amount of the award due to the applicant. Survivors of applicants who die during the processing of the claim but before VA makes a final decision, however, are eligible for only two years of accrued benefits.

Section 104 would add surviving parents of children with spina bifida who claimed benefits according to definitions set forth in chapter 18 of title 38, to the list of eligible survivors and would eliminate the two-year limit on accrued benefits for all eligible survivors, regardless of whether VA has made a final decision on the claim. Based on information provided by VA, CBO estimates that the agency awards accrued benefits payments to about 3,700 survivors a year and that, under current law (reflecting the *Bonny* decision), about 18 percent or 670 of these cases would be paid the full amount. Based on information provided by VA, CBO estimates that no more than 10 percent of the roughly 3,000 remaining accrued benefits payments would reflect more than two years of unpaid benefits.

VA only tracks data on the number of claims processed for accrued benefits payments and is unable to identify the number of claims it approves, the type of benefit approved, or the amount of the average payment. Absent this information, CBO assumes that all accrued benefits payments would be for veterans disability compensation because the majority of applications for VA benefits are for such payments. We also assume that all accrued benefits would be paid at an average disability rating of 30 percent, consistent with average benefit payments for new compensation cases, and that, on average, each of these 300 cases would receive an extra six months worth of payments.

According to data provided by VA, in 2002 the average annual compensation payment for a disability rating of 30 percent was $4,092. Such payments are adjusted annually for increases in the cost of living. Thus, CBO estimates that section 104 would increase direct spending by about $1 million in 2004, $3 million over the 2004-2008 period, and $7 million over the 2004-2013 period.

**Burial Plot Allowance.** Section 501 would extend eligibility for a burial plot allowance of up to $300 to veterans who are buried in state-owned cemeteries and served in the military during peacetime, and veterans who were discharged from active military, naval, or air service for a service-connected disability. Under current law, veterans are eligible for this benefit if the veteran:

- Dies in a VA facility,
- Is eligible for compensation or pension payments when he or she dies,
- Was discharged from active duty for an injury incurred or aggravated on duty,
- Has no reachable next of kin or resources to provide for burial, or
- Is a veteran of any war.

According to VA, the department paid a burial plot allowance for about 11,000 veterans who were buried in state-owned cemeteries in 2002. Using information from VA on the projected number of veteran deaths over the 2004-2013 period and the number of veterans buried in state-owned cemeteries who did not qualify for this benefit under current law, CBO estimates that an additional 1,400 veterans on average would qualify for the benefit under section 501. Thus, CBO estimates that this section would increase direct spending by less than $500,000 in 2004, about $2 million over the 2004-2008 period, and about $4 million over the 2004-2013 period.

**Spina Bifida Benefits.** Exposure to certain herbicides used by the Department of Defense (DoD) during the Vietnam War from 1962 to 1971 has been associated with a range of diseases from cancer to birth defects. Under current law, children with spina bifida who were born to veterans of the Vietnam War are entitled to monetary allowances, vocational rehabilitation benefits, and medical benefits administered by VA. Section 102 would expand eligibility for these benefits to children with spina bifida who were born to veterans who served in the demilitarized zone (DMZ) in the Republic of Korea between September 1, 1967, and August 31, 1971.

According to DoD, herbicides were used in the DMZ in Korea in 1968 and 1969. DoD estimates that up to 78,000 veterans may have served in the demilitarized zone during that time period, but that the number of veterans exposed could be much lower.

According to VA, under current law the department provides benefits to about 1,100 children born to Vietnam veterans out of a total of about 3.1 million veterans who served within the borders of Vietnam. In 2002, the costs of benefits provided by VA to children with spina bifida born to Vietnam veterans ranged, depending on the severity of the disease, from $2,736 to $16,248 a year per child for disability compensation and, on average, about $11,300 a year per child for medical benefits.

Based on VA's experience with benefits for children with spina bifida born to Vietnam veterans, CBO estimates that less than 20 children with spina bifida born to veterans who served in the DMZ between September 1, 1967, and August 31, 1971, would begin to receive benefits under section 102. CBO estimates that the increase in direct spending resulting from section 102 would be less than $500,000 in 2004, about $1 million over the 2004-2008 period, and about $3 million over the 2004-2013 period.

**Disability Benefits for Former Prisoners of War (POWs).** Under current law, VA generally deems a disability or disease to be service-connected for the purposes of disability compensation based on military medical records and physical examinations. Prior to July 18, 2003, for former POWs who were held captive for 30 days or more, VA followed a list of

15 diseases and disabilities that the department assumed were service-connected. Military medical records do not cover periods of captivity and may not provide adequate documentation for eligibility for disability compensation benefits. On July 18, 2003, VA issued a regulation amending Part 3 of title 38 of the Code of Federal Regulations to include cirrhosis of the liver to the list of diseases for which entitlement to service-connection is presumed for former POWs.

Section 201 also would add cirrhosis of the liver to the list of presumed service-connected disabilities for former POWs who were held captive for 30 days or more. Since the regulation has already taken effect, this portion of the provision would have no cost.

Section 201 also would eliminate the requirement that a POW be held prisoner for 30 days or more to qualify for presumed service-connection for five of the 16 presumed service-connected disabilities included under current law—specifically, psychosis, any of the anxiety states, dysthymic disorder (or depressive neurosis), organic residuals of frostbite, and post-traumatic osteoarthritis. Based on information provided by VA, CBO estimates that of the 39,000 living former POWs, no more than 400 were held captive for less than 30 days. About 70 percent, or around 280, of these former POWs are already receiving disability compensation based on their eligibility as a veteran. Due to the small number of former POWs who would become eligible for the new benefit and the fact that many are already receiving disability compensation, CBO estimates that the increase in direct spending from eliminating the 30-day requirement for these five disabilities would be less than $100,000 a year over the 2004-2013 period.

**Other Provisions Affecting Spending for Compensation, Pension, and Burial Benefits.** The following provisions would have an insignificant effect on direct spending for compensation, pension, and burial benefits:

- Under current law, a veteran who commits certain criminal acts loses eligibility for veterans' benefits that he or she would otherwise be due. Section 705 would add additional criminal acts to the list of crimes that would cause a veteran to lose eligibility for veterans' benefits—specifically, criminal acts involving chemical, biological, or nuclear weapons, genocide, and the murder of U.S. citizens outside of the United States.

- Under current law, veterans who die of service-connected disabilities are eligible for a $2,000 burial benefit. Veterans who receive compensation or pension benefits but die of a nonservice-connected condition are eligible for a $300 burial and funeral expenses benefit and another $300 allowance if the veteran is not interred in a cemetery that is under U.S. government jurisdiction. Veterans of the New Philippine

Scouts are currently eligible for half of the burial benefit amounts provided to veterans of the U. S. armed forces. Under section 212, veterans of the New Philippine Scouts would receive burial and plot allowances at the full rate if they are naturalized U.S. citizens living in the United States.

**Retirement Benefits**

Many retirees of the uniformed services have a Survivor Benefit Plan (SBP) premium payment deducted from their retirement annuity. The SBP was established in Public Law 92-425 to create an opportunity for military retirees to provide annuities for their survivors. Under current law, survivors of disabled veterans who are retired from the military, the Coast Guard, the Public Health Service, or the National Oceanic and Atmospheric Administration cannot receive both full SBP and DIC from VA. Because of this prohibition on concurrent receipt of these benefits, such survivors forgo a portion of their SBP annuity equal to the nontaxable DIC benefit. These survivors also receive a refund in premiums for the portion of the SBP annuity they chose to forgo to receive the nontaxable DIC benefit. If a survivor loses eligibility for DIC payments, he or she has the option to repay the refunded premiums to once again receive their full SBP annuity.

Section 101 would allow surviving spouses who remarry after age 57 to continue receiving DIC payments that they would otherwise be ineligible for (see "Retention of DIC for Remarried Spouses" above). Surviving spouses who would gain eligibility for DIC under section 101 and who would, as a result, be eligible for both SBP and DIC would forgo that portion of their SBP annuity equal to the nontaxable DIC benefit. Thus, section 101 would result in a savings in SBP payments for surviving spouses who under current law receive the full amount of their SBP payments.

In comparison to current law, the full amount of these savings would be reduced because of changes in the amount of premium refunds and repayments. For the survivors whose remarriage occurred prior to enactment of H.R. 2297, these savings would be partially offset by the refunding of the premium payments for the portion of SBP that these survivors would forgo to receive DIC. CBO expects that their refund payments would occur in either 2004 or 2005, depending on how soon VA restarts their DIC benefit.

Survivors who remarry after enactment of this legislation would continue receiving the same DIC and SBP payments as before their remarriage. If they remarry under current law, these survivors would become ineligible for DIC and would have to buy back their full SBP eligibility by repaying that portion of their premiums that had previously been refunded. Under section 101, these survivors would not repay the premiums because they would

continue receiving SBP at the reduced rate. Thus, under section 101, total SBP costs would increase by the amount that these survivors would not repay, and decrease by the amount of the DIC offset.

Based on information provided by DoD and VA, CBO estimates that about 400 survivors would receive both DIC and a SBP annuity each year over the 2004-2013 period and that the average annual SBP offset would be $9,209 in 2004, which would increase over the 2005-2013 period for cost-of-living adjustments. After accounting for changes in SBP premium refunds and repayments, CBO estimates that section 101 would increase spending for retirement from the uniformed services by $1 million in 2004, but reduce spending for these benefits by $12 million over the 2004-2008 period, and $34 million over the 2004-2013 period.

**PREVIOUS CBO ESTIMATES**

Over the past year, CBO has transmitted estimates for the following bills:

On March 28, 2003, CBO transmitted a cost estimate for H.R. 36, a bill to provide that remarriage of the surviving spouse of a deceased veteran after age 55 shall not result in termination of DIC otherwise payable to that surviving spouse, as introduced on January 7, 2003.

On April 3, 2003, CBO transmitted a cost estimate for H.R. 533, the Agent Orange Veterans' Children's Benefits Act of 2003, as introduced on February 5, 2003.

On May 19, 2003, CBO transmitted a cost estimate for H.R. 1460, the Veterans Entrepreneurship and Benefits Improvement Act of 2003, as ordered reported by the House Committee on Veterans' Affairs on May 15, 2003.

On May 19, 2003, CBO transmitted a cost estimate for H.R. 1257, the Selected Reserve Home Loan Equity Act, as ordered reported by the House Committee on Veterans' Affairs on May 15, 2003.

On May 23, 2003, CBO transmitted a cost estimate for H.R. 1838, a bill to revise the presumptions of service-connection relating to diseases and disabilities of former prisoners of war, as introduced on April 29, 2003.

On July 14, 2003, CBO transmitted a cost estimate for H.R. 2297, as ordered reported by the House Committee on Veterans' Affairs on June 26, 2003.

On October 16, 2003, CBO transmitted a cost estimate for S. 1132, the Veterans' Benefits Enhancement Act of 2003, as ordered reported by the Senate Committee on Veterans' Affairs on September 30, 2003.

Most provisions in H.R. 2297, as cleared by the Congress, are similar or identical to provisions in the above bills and have similar or identical estimated costs. However, the cleared version of H.R. 2297 provides that DIC shall not be terminated upon the remarriage of the surviving spouse of a deceased veteran after age 57—instead of age 55, as proposed in both H.R. 36 and H.R. 2297 as ordered reported by the House Committee in Veterans' Affairs. In addition, this later version of H.R. 2297 reflects changes to fees charged for home loans that are slightly different from the fee changes in the earlier versions of H.R. 2297 and in S. 1132, as ordered reported by the Senate Committee on Veterans' Affairs. Finally, H.R. 2297, as cleared by the Congress, includes a new provision for resale losses. All of these differences are reflected in the respective cost estimates.

**ESTIMATE PREPARED BY:**

Federal Costs:
  Housing: Sunita D'Monte
  Compensation: Melissa E. Zimmerman and Dwayne M. Wright
  Retirement Benefits: Sarah T. Jennings and Melissa E. Zimmerman
  Readjustment Benefits: Sarah T. Jennings

**ESTIMATE APPROVED BY:**

Peter H. Fontaine
Deputy Assistant Director for Budget Analysis

**DA 018**

HR 1589 IH

110th CONGRESS

1st Session

**H. R. 1589**

To amend title 10, United States Code, to repeal the offset from surviving spouse annuities under the military Survivor Benefit Plan for amounts paid by the Secretary of Veterans Affairs as dependency and indemnity compensation, to repeal the optional annuity authority for the dependent children of a member when there is an eligible surviving spouse, and for other purposes.

**IN THE HOUSE OF REPRESENTATIVES**

**March 20, 2007**

DA 019

Mr. BROWN of South Carolina (for himself and Mr. TOM DAVIS of Virginia) introduced the following bill; which was referred to the Committee on Armed Services

**A BILL**

To amend title 10, United States Code, to repeal the offset from surviving spouse annuities under the military Survivor Benefit Plan for amounts paid by the Secretary of Veterans Affairs as dependency and indemnity compensation, to repeal the optional annuity authority for the dependent children of a member when there is an eligible surviving spouse, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. SHORT TITLE.

This Act may be cited as the `Military Surviving Spouses Equity Act'.

## SEC. 2. REPEAL OF DEPENDENCY AND INDEMNITY COMPENSATION OFFSET FROM SURVIVOR BENEFIT PLAN SURVIVING SPOUSE ANNUITIES AND OPTIONAL ANNUITY

**AUTHORITY.**

(a) Repeal- Subsections (c), (e), and (k) of section 1450 of title 10, United States Code, and subsection (c)(2) of section 1451 of such title are repealed.

(b) Recoupment of Certain Amounts Previously Refunded to SPB Recipients-

(1) REPAYMENT REQUIRED- A surviving spouse who is in receipt of an SBP annuity that is in effect before the effective date of the amendments made by subsection (a) and that is adjusted by reason of such amendments and who had previously received an SBP retired pay refund shall repay an amount determined under paragraph (2). Any such repayment shall be made in the same manner as a repayment under subsection (k)(2) of section 1450 of title 10, United States Code, as in effect on the day before the effective date of such amendments.

(2) AMOUNT OF REPAYMENT- The amount of a repayment under paragraph (1) shall be the amount that bears the same ratio to the amount of that refund as the surviving spouse's life expectancy (determined in accordance with standard actuarial practices) bears to the anticipated total duration of the annuity (determined as the sum of such life expectancy and the duration of the annuity already received)

(3) WAIVER OF REPAYMENT- The Secretary of Defense may waive the requirement that a surviving spouse make a repayment under paragraph (1) if the Secretary determines that--

(A) hardship or other circumstances make repayment unwarranted; or

(B) requiring repayment would otherwise not be in the best interests of the United States.

(4) DEFINITIONS- In this subsection:

(A) The term `SBP annuity' means an annuity under the program established under subchapter II of chapter 73 of title 10, United States Code.

(B) The term `SBP retired pay refund' means a refund under subsection (e) of section 1450 of title 10, United States Code, as in effect before the effective date of the amendments made by subsection (a).

(c) Repeal of Optional Annuity Authority- Subsection (d) of section 1448 of title 10, United States Code, is amended--

(1) in paragraph (1), by striking `Except as provided in paragraph (2)(B), the Secretary' and inserting `The

DA 020

Secretary'; and

(2) by striking paragraph (2) and inserting the following new paragraph:

`(2) PAYMENT OF ANNUITY TO DEPENDENT CHILDREN WHEN NO ELIGIBLE SURVIVING SPOUSE- In the case of a member described in paragraph (1), the Secretary concerned shall pay an annuity under this subchapter to the member's dependent children under section 1450(a)(2) of this title when there is no eligible surviving spouse.'.

(d) Restoration of Eligibility for Previously Eligible Surviving Spouses-

(1) RESTORATION- The Secretary of Defense shall restore eligibility for an annuity under subchapter II of chapter 73 of title 10, United States Code, to any eligible surviving spouse who, before the effective date of the amendments made by subsection (c), agreed to transfer payment of such annuity to a surviving child or children of a member of the Armed Forces under section 1448(d)(2)(B) of such title, as in effect before such effective date. Such eligibility shall be restored whether or not payment to such child or children subsequently was terminated due to loss of dependent status or death.

(2) DEFINITION- In this subsection, the term `eligible surviving spouse' includes a person who was previously eligible for payment of such annuity as the spouse of a member of the Armed Forces and is unremarried after the death of the member, is remarried after having attained age 55, or whose second or subsequent marriage has been terminated by death, divorce, or annulment.

(e) Effective Date and Application of Amendments-

(1) EFFECTIVE DATE- The amendments made by this section shall take effect on the later of--

(A) October 1, 2007; and

(B) the date of the enactment of this Act.

(2) APPLICABILITY- The amendments made by subsections (a) and (c) shall apply with respect to payment of annuities under subchapter II of chapter 73 of title 10, United States Code, for months beginning on or after the effective date of such amendments under paragraph (1).

*END*

DA 021

**H.R.1589**
**Title:** To amend title 10, United States Code, to repeal the offset from surviving spouse annuities under the military Survivor Benefit Plan for amounts paid by the Secretary of Veterans Affairs as dependency and indemnity compensation, to repeal the optional annuity authority for the dependent children of a member when there is an eligible surviving spouse, and for other purposes.
**Sponsor:** Rep Brown, Henry E., Jr. [SC-1] (introduced 3/20/2007) Cosponsors (71)
**Latest Major Action:** 4/3/2007 Referred to House subcommittee. Status: Referred to the Subcommittee on Military Personnel.

| | | | |
|---|---|---|---|
| All Information (except text) | Text of Legislation | CRS Summary | Major Congressional Actions |
| Titles | Cosponsors (71) | Committees | All Congressional Actions |
| Related Bills | Amendments | Related Committee Documents | All Congressional Actions with Amendments<br>With links to *Congressional Record* pages, votes,reports |
| CBO Cost Estimates | Subjects | | |



DA21A

S 935 IS

110th CONGRESS

1st Session

**S. 935**

To repeal the requirement for reduction of survivor annuities under the Survivor Benefit Plan by veterans' dependency and indemnity compensation, and for other purposes.

**IN THE SENATE OF THE UNITED STATES**

**March 20, 2007**

Mr. NELSON of Florida (for himself, Mr. HAGEL, Mr. BINGAMAN, Ms. MIKULSKI, Mrs. LINCOLN, Mr. BIDEN, Mr. VITTER, Mr. DOMENICI, Mr. KERRY, Mr. MARTINEZ, Mr. SALAZAR, Ms. SNOWE, Mr. BROWN, Mrs. FEINSTEIN, Mrs. MURRAY, and Mrs. CLINTON) introduced the following bill; which was read twice and referred to the Committee on Armed Services

DA 022

**A BILL**

To repeal the requirement for reduction of survivor annuities under the Survivor Benefit Plan by veterans' dependency and indemnity compensation, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. REPEAL OF REQUIREMENT OF REDUCTION OF SBP SURVIVOR ANNUITIES BY DEPENDENCY AND INDEMNITY COMPENSATION.

(a) Repeal-

(1) IN GENERAL- Subchapter II of chapter 73 of title 10, United States Code, is amended as follows:

(A) In section 1450, by striking subsection (c).

(B) In section 1451(c)--

(i) by striking paragraph (2); and

(ii) by redesignating paragraphs (3) and (4) as paragraphs (2) and (3), respectively.

(2) CONFORMING AMENDMENTS- Such subchapter is further amended as follows:

(A) In section 1450--

(i) by striking subsection (e); and

(ii) by striking subsection (k).

(B) In section 1451(g)(1), by striking subparagraph (C).

(C) In section 1452--

(i) in subsection (f)(2), by striking `does not apply--' and all that follows and inserting `does not apply in the case of a deduction made through administrative error.'; and

(ii) by striking subsection (g).

(D) In section 1455(c), by striking `, 1450(k)(2),'.

DA 023

(b) Prohibition on Retroactive Benefits- No benefits may be paid to any person for any period before the effective date provided under subsection (f) by reason of the amendments made by subsection (a).

(c) Prohibition on Recoupment of Certain Amounts Previously Refunded to SBP Recipients- A surviving spouse who is or has been in receipt of an annuity under the Survivor Benefit Plan under subchapter II of chapter 73 of title 10, United States Code, that is in effect before the effective date provided under subsection (f) and that is adjusted by reason of the amendments made by subsection (a) and who has received a refund of retired pay under section 1450(e) of title 10, United States Code, shall not be required to repay such refund to the United States.

(d) Repeal of Authority for Optional Annuity for Dependent Children- Section 1448(d)(2) of such title is amended--

(1) by striking `DEPENDENT CHILDREN- ' and all that follows through `In the case of a member described in paragraph (1),' and inserting `DEPENDENT CHILDREN- In the case of a member described in paragraph (1),'; and

(2) by striking subparagraph (B).

(e) Restoration of Eligibility for Previously Eligible Spouses- The Secretary of the military department concerned shall restore annuity eligibility to any eligible surviving spouse who, in consultation with the Secretary, previously elected to transfer payment of such annuity to a surviving child or children under the provisions of section 1448(d)(2)(B) of title 10, United States Code, as in effect on the day before the effective date provided under subsection (f). Such eligibility shall be restored whether or not payment to such child or children subsequently was terminated due to loss of dependent status or death. For the purposes of this subsection, an eligible spouse includes a spouse who was previously eligible for payment of such annuity and is not remarried, or remarried after having attained age 55, or whose second or subsequent marriage has been terminated by death, divorce or annulment.

(f) Effective Date- The sections and the amendments made by this section shall take effect on the later of--

(1) the first day of the first month that begins after the date of the enactment of this Act; or

(2) the first day of the fiscal year that begins in the calendar year in which this Act is enacted.

DA 024

## SEC. 2. EFFECTIVE DATE OF PAID-UP COVERAGE UNDER SURVIVOR BENEFIT PLAN.

(a) Survivor Benefit Plan- Section 1452(j) of title 10, United States Code, is amended by striking `October 1, 2008' and inserting `October 1, 2007'.

(b) Retired Serviceman's Family Protection Plan- Section 1436a of such title is amended by striking `October 1, 2008' and inserting `October 1, 2007'.

*END*

THOMAS Home | Contact | Accessibility | Legal | USA.gov

**S.935**
**Title:** A bill to repeal the requirement for reduction of survivor annuities under the Survivor Benefit Plan by veterans' dependency and indemnity compensation, and for other purposes.
**Sponsor:** Sen Nelson, Bill [FL] (introduced 3/20/2007) Cosponsors (41)
**Related Bills:** H.R.1927
**Latest Major Action:** 3/20/2007 Referred to Senate committee. Status: Read twice and referred to the Committee on Armed Services.

| | | | |
|---|---|---|---|
| All Information (except text) | Text of Legislation | CRS Summary | Major Congressional Actions |
| Titles | Cosponsors (41) | Committees | All Congressional Actions |
| Related Bills | Amendments | Related Committee Documents | All Congressional Actions with Amendments<br>With links to *Congressional Record* pages, votes,reports |
| CBO Cost Estimates | Subjects | | |



DA24A