# APPENDIX

# INDEX TO PLAINTIFFS' APPENDIX


**Document** **Page**

H.R. Rep. No. 107-472 (2002),
*Veterans' and Survivors' Benefits Expansion Act of 2002* ................................1

H.R. Rep. No. 108-211 (2003), *Veterans Benefit Act of 2003*.....................................24

149 Cong. Rec. H9305 and H9310 (Oct. 8, 2003).......................................................91

The Congressional Budget Office Cost Estimate, H.R. 1108 (Apr. 19, 2002)............99

The Congressional Budget Office Cost Estimate, H.R. 36 (Mar. 28, 2003) .............103

Philpott, T., "Congress, DOD Differ On Scope Of Restored Widow Benefits,"
*Military Update* (The Fleet Reserve Association) (Jan. 15, 2004)................107

# Exhibit 1

107TH CONGRESS 2d Session } HOUSE OF REPRESENTATIVES { REPORT 107–472

# VETERANS' AND SURVIVORS' BENEFITS EXPANSION ACT OF 2002

MAY 16, 2002.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. SMITH of New Jersey, from the Committee on Veterans' Affairs, submitted the following

## REPORT

[To accompany H.R. 4085]

[Including cost estimate of the Congressional Budget Office]

The Committee on Veterans' Affairs, to whom was referred the bill (H.R. 4085) to increase, effective as of December 1, 2002, the rates of disablity compensation for veterans with service-connected disabilities and the rates of dependency and indemnity compensation for survivors of certain service-connected disabled veterans, and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

The amendments are as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Veterans' and Survivors' Benefits Expansion Act of 2002".

**SEC. 2. INCREASE IN RATES OF DISABILITY COMPENSATION AND DEPENDENCY AND INDEMNITY COMPENSATION.**

(a) RATE ADJUSTMENT.—The Secretary of Veterans Affairs shall, effective on December 1, 2002, increase the dollar amounts in effect for the payment of disability compensation and dependency and indemnity compensation by the Secretary, as specified in subsection (b).

(b) AMOUNTS TO BE INCREASED.—The dollar amounts to be increased pursuant to subsection (a) are the following:

(1) COMPENSATION.—Each of the dollar amounts in effect under section 1114 of title 38, United States Code.

(2) ADDITIONAL COMPENSATION FOR DEPENDENTS.—Each of the dollar amounts in effect under sections 1115(1) of such title.

(3) CLOTHING ALLOWANCE.—The dollar amount in effect under section 1162 of such title.

(4) NEW DIC RATES.—The dollar amounts in effect under paragraphs (1) and (2) of section 1311(a) of such title.

99–006

(5) OLD DIC RATES.—Each of the dollar amounts in effect under section 1311(a)(3) of such title.

(6) ADDITIONAL DIC FOR SURVIVING SPOUSES WITH MINOR CHILDREN.—The dollar amount in effect under section 1311(b) of such title.

(7) ADDITIONAL DIC FOR DISABILITY.—The dollar amounts in effect under sections 1311(c) and 1311(d) of such title.

(8) DIC FOR DEPENDENT CHILDREN.—The dollar amounts in effect under sections 1313(a) and 1314 of such title.

(c) DETERMINATION OF INCREASE.—(1) The increase under subsection (a) shall be made in the dollar amounts specified in subsection (b) as in effect on November 30, 2002.

(2) Except as provided in paragraph (3), each such amount shall be increased by the same percentage as the percentage by which benefit amounts payable under title II of the Social Security Act (42 U.S.C. 401 et seq.) are increased effective December 1, 2002, as a result of a determination under section 215(i) of such Act (42 U.S.C. 415(i)).

(3) Each dollar amount increased pursuant to paragraph (2) shall, if not a whole dollar amount, be rounded down to the next lower whole dollar amount.

(d) SPECIAL RULE.—The Secretary may adjust administratively, consistent with the increases made under subsection (a), the rates of disability compensation payable to persons within the purview of section 10 of Public Law 85–857 (72 Stat. 1263) who are not in receipt of compensation payable pursuant to chapter 11 of title 38, United States Code.

(e) PUBLICATION OF ADJUSTED RATES.—At the same time as the matters specified in section 215(i)(2)(D) of the Social Security Act (42 U.S.C. 415(i)(2)(D)) are required to be published by reason of a determination made under section 215(i) of such Act during fiscal year 2003, the Secretary of Veterans Affairs shall publish in the Federal Register the amounts specified in subsection (b), as increased pursuant to that section.

**SEC. 3. RETENTION OF DEPENDENCY AND INDEMNITY COMPENSATION FOR SURVIVING SPOUSES REMARRYING AFTER AGE 65.**

(a) EXCEPTION TO TERMINATION OF BENEFITS UPON REMARRIAGE.—Paragraph (2) of section 103(d) of title 38, United States Code, is amended by striking "if the remarriage" and all that follows and inserting "if—

"(A) the remarriage occurs after the surviving spouse attains age 65 ;

"(B) the remarriage has been terminated by death; or

"(C) the remarriage has been terminated by divorce, unless the Secretary determines that the divorce was secured through fraud or collusion.".

(b) CONFORMING AMENDMENTS.—Paragraph (4) of such section is amended—

(1) by striking "The first month" and all the follows through "shall be" and inserting the following "When eligibility for benefits for a surviving spouse is restored by reason of this subsection, the first month of eligibility for such benefits shall be"; and

(2) in subparagraph (A), by striking "described in" and inserting "with a remarriage described in subparagraph (B) or (C) of".

(c) INCLUSION OF DEATH COMPENSATION AMONG RESTORED BENEFITS.—Subparagraph (A) of paragraph (5) of such section is amended to read as follows:

"(A) Sections 1121 and 1311, relating to death compensation and dependency and indemnity compensation, respectively.".

(d) APPLICATION FOR BENEFITS.—In the case of an individual who but for having remarried would be eligible for dependency and indemnity compensation under section 1311 of title 38, United States Code, or death compensation under section 1121 of such title, and whose remarriage was before the date of the enactment of this Act and after the individual had attained age 65, the individual shall be eligible for such compensation by reason of the amendments made by subsection (a) only if the individual submits an application for such compensation to the Secretary of Veterans Affairs not later than the end of the one-year period beginning on the date of the enactment of this Act.

(e) COORDINATION OF BENEFITS.—Section 1311 of such title is amended by adding at the end the following new subsection:

"(e) In the case of an individual who is eligible for dependency and indemnity compensation under this section by reason of section 103(d)(2)(A) of this title who is also eligible for benefits under another provision of law by reason of such individual's status as the surviving spouse of a veteran, then, notwithstanding any other provision of law, no reduction in benefits under such other provision of law shall be made by reason of such individual's eligibility for benefits under this section.".

**SEC. 4. UNIFORM HOME LOAN GUARANTY FEES FOR QUALIFYING MEMBERS OF THE SELECTED RESERVE AND ACTIVE DUTY VETERANS.**

(a) IN GENERAL.—Paragraph (2) of section 3729(b) of title 38, United States Code, is amended—

(1) by inserting "(A)" after "(2)";

(2) by inserting "for any loan closed after September 30, 2005" after "paragraph (1)"; and

(3) by adding at the end the following:

"(B) The loan fee table referred to in paragraph (1) for any loan closed during the period beginning on October 1, 2002, and ending on September 30, 2005, is as follows:

"LOAN FEE TABLE

| Type of loan | Veteran | Other obligor |
|---|---|---|
| (A)(i) Initial loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other initial loan described in section 3710(a) other than with 5-down or 10-down (closed before October 1, 2008) | 2.00 | NA |
| (A)(ii) Initial loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other initial loan described in section 3710(a) other than with 5-down or 10-down (closed on or after October 1, 2008) | 1.25 | NA |
| (B)(i) Subsequent loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other subsequent loan described in section 3710(a) (closed before October 1, 2008) | 3.00 | NA |
| (B)(ii) Subsequent loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other subsequent loan described in section 3710(a) (closed on or after October 1, 2008) | 1.25 | NA |
| (C)(i) Loan described in section 3710(a) to purchase or construct a dwelling with 5-down (closed before October 1, 2008) | 1.50 | NA |
| (C)(ii) Loan described in section 3710(a) to purchase or construct a dwelling with 5-down (closed on or after October 1, 2008) | 0.75 | NA |
| (D)(i) Initial loan described in section 3710(a) to purchase or construct a dwelling with 10-down (closed before October 1, 2008) | 1.25 | NA |
| (D)(ii) Initial loan described in section 3710(a) to purchase or construct a dwelling with 10-down (closed on or after October 1, 2008) | 0.50 | NA |
| (E) Interest rate reduction refinancing loan | 0.50 | NA |
| (F) Direct loan under section 3711 | 1.00 | NA |
| (G) Manufactured home loan under section 3712 (other than an interest rate reduction refinancing loan) | 1.00 | NA |
| (H) Loan to Native American veteran under section 3762 (other than an interest rate reduction refinancing loan) | 1.25 | NA |
| (I) Loan assumption under section 3714 | 0.50 | 0.50 |
| (J) Loan under section 3733(a) | 2.25 | 2.25". |

(b) CONFORMING AMENDMENT.—Paragraph (4)(A) of such section is amended by inserting before the period at the end the following: ", and the term 'veteran' means any veteran eligible for the benefits of this chapter".

**SEC. 5. LIFE INSURANCE PROGRAMS.**

(a) INCREASE OF VETERANS' MORTGAGE LIFE INSURANCE COVERAGE TO $150,000.—(1) Section 2106(b) of title 38, United States Code, is amended by striking "$90,000" and inserting "$150,000".

(2) The amendment made by paragraph (1) shall apply with respect to insurance payable under section 2106 of title 38, United States Code, in the case of a veteran insured under that section who dies on or after the date of enactment of this Act.

(b) AUTHORITY FOR VETERANS' MORTGAGE LIFE INSURANCE TO BE CARRIED BEYOND AGE 70.—Section 2106 of such title is amended—

(1) in subsection (a), by inserting "age 69 or younger" after "any eligible veteran"; and

(2) in subsection (i), by striking paragraph (2) and redesignating paragraphs (3) and (4) as paragraphs (2) and (3), respectively.

**SEC. 6. INCREASE IN AGGREGATE ANNUAL AMOUNT AVAILABLE FOR STATE APPROVING AGENCIES FOR ADMINISTRATIVE EXPENSES FOR FISCAL YEARS 2003, 2004, AND 2005.**

Section 3674(a)(4) of title 38, United States Code, is amended by inserting before the period at the end of the first sentence the following: ", and for each of fiscal years 2003, 2004, and 2005, $18,000,000".

Amend the title so as to read:

A bill to amend title 38, United States Code, to provide a cost-of-living increase in the rates of compensation for veterans with service-connected disability and dependency and indemnity compensation for surviving spouses of such veterans, to expand certain benefits for veterans and their survivors, and for other purposes.

## INTRODUCTION

The reported bill reflects the Committee's consideration of several bills introduced during the 107th Congress, to include H.R. 1108, H.R. 2095, H.R. 2222, H.R. 3731, and H.R. 4085.

On April 11, 2002, the Subcommittee on Benefits held a hearing and considered the following bills: H.R. 1108, to provide that remarriage of the surviving spouse of a veteran after age 55 shall not result in termination of dependency and indemnity compensation; H.R. 2095, the Reservist VA Home Loan Fairness Act of 2001; H.R. 2222, the Veterans Life Insurance Improvement Act of 2001; and H.R. 3731, to increase amounts available to state approving agencies to ascertain the qualifications of educational institutions for furnishing courses of education to veterans and eligible persons under the Montgomery GI Bill and under other programs of education administered by the Department of Veterans Affairs.

On May 2, 2002, the Subcommittee on Benefits met and unanimously ordered H.R. 4085, as amended, reported favorably to the full Committee.

On May 9, 2002, the full Committee met and ordered H.R. 4085 reported favorably, as amended, to the House by unanimous voice vote.

## SUMMARY OF THE REPORTED BILL

H.R. 4085, as amended, would:

1. Provide, effective December 1, 2002, a cost-of-living adjustment to the rates of disability compensation for veterans with service-connected disabilities and to the rates of dependency and indemnity compensation for survivors of certain service-connected disabled veterans; the percentage amount would be equal to the increase for benefits provided under the Social Security Act, which is calculated based upon changes in the Consumer Price Index.

2. Provide that remarriage of the surviving spouse of a veteran after attaining age 65 would not result in termination of dependency and indemnity compensation, eligibility for CHAMPVA medical care, education, and housing loan benefits; those surviving spouses who remarried at or after age 65 prior to enactment of the bill would have one year from date of enactment to reapply for benefits.
3. Provide that, through fiscal year 2005, the home loan fees charged qualifying members of the Selected Reserve be equal to those fees charged active duty veterans.
4. Increase Veterans' Mortgage Life Insurance coverage from $90,000 to $150,000.
5. Allow veterans over the age of 70 to continue coverage under Veterans' Mortgage Life Insurance.
6. Increase funding for state approving agencies in fiscal years 2003–2005 to $18 million per year.

## Background and Discussion

*Increase in rates of disability compensation and dependency and indemnity compensation.* Section 2 of the bill would increase, effective December 1, 2002, the rates of compensation for service-connected disabilities and the rates of dependency and indemnity compensation (DIC) for surviving spouses and children of veterans who die of service-connected causes, as well as the additional amounts for dependents and survivors, and clothing allowances for certain veterans. The percentage of increase would be the same as that received by Social Security recipients.

The Committee annually reviews the service-connected disability compensation and DIC programs to ensure that the benefits provide reasonable and adequate compensation for disabled veterans and their families. Based on this review, the Congress acts annually to provide a cost-of-living adjustment (COLA) in compensation and DIC benefits. The Congress has provided annual increases in these rates for every fiscal year since 1976.

*Retention of dependency and indemnity compensation for surviving spouses remarrying after age 65.* Dependency and indemnity compensation (DIC) is a tax-free monthly benefit paid to the surviving spouse of a veteran who dies as a result of military service. While current law prevents payment of DIC during the course of a subsequent marriage, Public Law 105–178 allowed reinstatement of this benefit to the surviving spouse if the remarriage is terminated. As the Honorable Michael Bilirakis stated in testimony before the Subcommittee on Benefits on April 11, 2002, "DIC is the only federal annuity program that does not allow a widow who is receiving compensation to remarry at an older age and retain her annuity." It is the Committee's intent that an older surviving spouse who chooses to remarry should not be discouraged from doing so by the loss of DIC benefits.

Section 3 would allow a surviving spouse, who remarry after attaining age 65, to retain dependency and indemnity compensation and related benefits. Spouses who remarried after attaining age 65 prior to enactment of the bill would have one year from date of enactment to apply for reinstatement of this benefit. Health insur-

ance, home loan, and education benefits for these surviving spouses would also be restored. Moreover, the Committee has included language so that this additional amount will be paid to all remarried surviving spouses, and that no reduction of other benefits to which the surviving spouse may be entitled, such as Survivor Benefit Plan payments, would occur.

The Committee has not been able to obtain accurate data with respect to the numbers of surviving spouses likely to be affected by this provision. However, for oversight purposes, the Committee expects the Department of Veterans Affairs to obtain and maintain data concerning the number and age of those surviving spouses who apply for reinstatement of their DIC benefits under this provision.

*Uniform home loan guaranty fees for qualifying members of the Selected Reserve and active duty veterans.* Section 4 would amend the Loan Fee Table in section 3729(b) of title 38, United States Code, to provide for uniform funding fees charged to members of the Selected Reserve and active duty veterans for home loans under VA's Home Loan Guaranty Program. The fee would be reduced for the period beginning on October 1, 2002 and ending on September 30, 2005.

Currently, members of the Select Reserve pay a 0.75 percent higher funding fee under the home loan program than other eligible veterans. According to VA, the average foreclosure rate for reservists since the start of the program in 1993 has been 2.71 percent, a low rate compared to 3.95 percent for other home loan beneficiaries. Thus, the additional funding fee is not justified on the basis of an increased risk. In order to evaluate the effect of this provision, the Committee expects VA to continue to obtain and maintain data concerning the number of reservists who participate in this program and to separately identify their foreclosure rates.

*Veterans' Mortgage Life Insurance coverage.* Section 5(a) would increase the amount of coverage provided under Veterans' Mortgage Life Insurance (VMLI) from $90,000 to $150,000. VMLI is designed to provide financial protection to cover eligible veterans' home mortgages in the event of death. VMLI is issued to those severely disabled veterans who have received grants for Specially Adapted Housing from the Department of Veterans Affairs. Section 5(a) would increase the amount of VMLI allowed an eligible veteran to $150,000, which is payable if the veteran dies before the mortgage is paid off.

Section 5(b) would permit service-connected veterans to continue their VMLI coverage beyond age 70. Under current law, the insurance is cancelled on the veteran's 70th birthday. Although no new policies would be issued after age 70, this section provides that the policy will not be terminated due to age. This is consistent with insurance practice under commercial policies.

*Increase in aggregate annual amount available for state approving agencies for administrative expenses for fiscal years 2003, 2004, and 2005.* Section 6 would increase the funding available for state approving agencies (SAAs) from $14 million a year to $18 million a year during fiscal years 2003 through 2005.

From fiscal years 1995 to 2000, SAA funding was capped—with no annual increase—at $13 million. Public Law 106–419 increased

SAA funding to $14 million for fiscal years 2001 and 2002. Under current law, the authorization amount would be reduced to $13 million as of October 1, 2002.

State approving agencies review and evaluate education programs in each state, and subsequently approve or deny each program for use of VA education benefits under the Montgomery GI Bill and three other VA veterans' educational assistance programs. SAAs usually operate through state departments of education or postsecondary education commissions. SAAs also approve employer-sponsored on-the-job training and apprenticeship programs, some through state departments of labor.

The need to increase funding for SAAs primarily reflects new statutory duties, under Public Law 107–14 and Public Law 107–103, in occupational licensing and credentialing, as well as expanded outreach to veterans, servicemembers and employers.

### Section-By-Section Analysis

Section 1 would provide that this Act may be cited as the "Veterans' and Survivors' Benefits Expansion Act of 2002".

Section 2(a) would authorize the Secretary of Veterans Affairs to increase, effective December 1, 2002, the dollar amounts in effect for the payment of disability compensation and dependency and indemnity compensation.

Section 2(b) would specify the programs to receive increased dollar amounts as compensation, additional compensation for dependents, clothing allowance, new DIC rates, old DIC rates, additional DIC for surviving spouses with minor children, additional DIC for disability, and DIC for dependent children.

Section 2(c)(1) would increase the dollar amounts for those programs specified in subsection (b) based on the amount in effect on November 30, 2002.

Section 2(c)(2) would specify that each amount shall be increased by the same percentage by which benefits are increased under title II of the Social Security Act (42 U.S.C. 415(i)).

Section 2(c)(3) would round down to the next lower dollar amount all compensation and DIC benefits, when the amount is not a whole dollar amount.

Section 2(d) would provide a special rule authorizing the Secretary of Veterans Affairs to adjust administratively, consistent with the increases made under subsection (a), the rates of disability compensation payable to persons within the purview of section 10 of Public Law 85–857, who are not in receipt of compensation payable pursuant to chapter 11 of title 38, United States Code.

Section 2(e) would require the Secretary of Veterans Affairs to publish in the Federal Register the amounts specified in subsection (b), as increased pursuant to that section.

Section 3(a) would amend paragraph 2 of section 103(d) of title 38, United States Code, to provide in subparagraph (A) that remarriage of a surviving spouse after attaining age 65 shall not bar the furnishing of dependency and indemnity compensation, death compensation, medical care for survivors and dependents of certain veterans, educational assistance, and housing loan benefits. Subpara-

graphs (B) and (C) of paragraph (2) of section 103(d) are restatements of current law.

Section 3(b) would provide that when eligibility for benefits is restored under subparagraph (B) or (C) of paragraph (2) of section 103(d), the first month of eligibility shall be the month after the remarriage has been terminated by death or divorce.

Section 3(c) would amend subparagraph (A) of section 103(d)(5) of title 38, United States Code, to add section 1121 of title 38, United States Code, relating to death compensation, to section 1311 on dependency and indemnity compensation.

Section 3(d) would provide that a surviving spouse who would have been eligible for dependency and indemnity compensation but for having remarried, would be eligible to have benefits reinstated if the remarriage took place after the surviving spouse attained 65 years of age before enactment of this Act, if application for such compensation is made not later than the end of the one year period beginning on the date of enactment of this Act.

Section 3(e) would provide that in the case of an individual who is eligible for dependency and indemnity compensation under section 3(a) of the bill, and who is also entitled to benefits under any other provision of law, there shall be no reduction in benefits under such other provision of law, by reason of eligibility for dependency and indemnity compensation.

Section 4(a) would amend paragraph (2) of section 3729(b) of title 38, United States Code, to eliminate the additional 0.75 percent funding fee charged to members of the Select Reserve for the period beginning on October 1, 2002 and ending on September 30, 2005, and establish a separate loan fee table for VA home loans guaranteed between October 1, 2002 and September 30, 2005.

Section 4(b) would amend section 3729(b)(4) of title 38, United States Code, by adding the definition of "veteran" for purposes of the loan table in effect between October 1, 2002 and September 30, 2005 as any veteran eligible for the benefits of this chapter.

Section 5(a)(1) would amend section 2106(b) of title 38, United States Code, by increasing coverage under the Veterans' Mortgage Life Insurance program from $90,000 to $150,000.

Section 5(a)(2) would provide that amendments made by this section shall apply to deaths occurring on or after the date of enactment of this Act.

Section 5(b) would amend section 2106 of title 38, United States Code, to provide that Veterans' Mortgage Life Insurance may be issued only to eligible veterans who are age 69 or younger.

Section 6 would amend section 3674(a)(4) of title 38, United States Code, to provide $18 million for each of fiscal years 2003, 2004, and 2005.

## Performance Goals and Objectives

The reported bill would authorize veteran and survivor benefits enhancements and program improvements under laws administered by the Secretary of Veterans Affairs. Their performance goals and objectives are established in annual performance plans and are subject to the Committee's regular oversight.

## STATEMENT OF THE VIEWS OF THE ADMINISTRATION

**Statement of Daniel L. Cooper, Under Secretary for Benefits, Department of Veterans Affairs Before the House Veterans' Affairs, Subcommittee on Benefits, Thursday, April 11, 2002**

Mr. Chairman and Members of the Subcommittee, thank you for the opportunity to testify today on several legislative items of interest to the Department of Veterans Affairs (VA). Accompanying me today are Robert Epley, Associate Deputy Under Secretary for Policy and Program Management, and John Thompson, Deputy General Counsel.

Before I discuss the bills the Subcommittee is considering today, I would like to note that, as you know, these measures would affect direct spending and receipts and, therefore, would be subject to pay-as-you-go (PAYGO) rules. Accordingly, the support VA expresses here for the subject bill provisions is contingent on accommodating the provisions within the budget submitted by the President.

*H.R. 1108*

First, Mr. Chairman, I would like to provide VA's views on H.R. 1108. This bill would amend 38 U.S.C. § 103(d), to remove the bar on the payment of Dependency and Indemnity Compensation (DIC) benefits to surviving spouses who remarry after age 55. VA supports enactment of this legislation.

The DIC program provides tax-free monthly benefits to the surviving spouses of veterans who die in or as a result of military service. Current law denies DIC during periods of surviving spouses' subsequent marriages or (in cases not involving remarriage) during periods when they live with another person and hold themselves out openly to the public to be that persons' spouses.

DIC was created for two purposes: to replace family income lost due to the servicemember's or veteran's death and to serve as reparation for the death. In 1956, the Servicemen's and Veterans' Survivor Benefits Act replaced the preexisting death compensation program and the $10,000 Servicemen's Indemnity Act payment with DIC. The House Select Committee on Survivor Benefits explained, in a 1955 report, H.R. Rep. No. 84–993, that, "these two separate and distinct survivor benefit programs . . . would become one. To this limited extent one of the objectives of the committee, greater simplicity, would be accomplished and the long-term interest and equity of survivors protected." This Act established a monthly DIC rate for widows consisting of a fixed rate plus a percentage of the basic pay prescribed for the deceased servicemember's pay grade and length of service. It is apparent from this Committee Report that the fixed rate represented the "indemnity" or reparation element of the compensation and the percentage of the deceased servicemember's basic pay represented the "dependency" or income-replacement element. In this manner, DIC was intended to meet, at least in part, the Government's obligation to those who died in the defense of our country. An expansion of eligibility for DIC would well serve this purpose for the following reasons.

Marital decisions often involve consideration of economic consequences, and often those consequences are different for older surviving spouses, who may no longer be in the job market and who may have insufficient income apart from DIC to maintain a basic standard of living regardless of whether they remarry. The beneficiaries targeted by this proposal are particularly disadvantaged by loss of DIC upon remarriage because they are often retired or contemplating retirement, may be disabled, and may be living on a fixed income. Those whose deceased-veteran spouses had been severely disabled may have foregone careers of their own in order to care for them. Thus, they are often unable to offset lost DIC by earnings or other income. Furthermore, when a surviving spouse of advanced age remarries, termination of DIC may impose severe financial hardship because the new spouse, similarly advanced in age, is generally preparing for retirement or is already retired, may be disabled, and may be living on a fixed income. In other words, the new spouse also may have limited income and may be unable, because of age or disablement, to augment it. To the extent the DIC program was intended to provide a replacement for a veteran's contribution to household support, this contribution is still necessary for a surviving spouse of advanced age even if the surviving spouse remarries, because remarriage often does not adequately provide for his or her subsistence needs. Further, to the extent that DIC provides indemnification for the veteran's death, the basis for compensation is not eliminated by the surviving spouse's remarriage.

The new provision would assist surviving spouses by allowing those over age 55 to maintain their standards of living, thus removing any economic disincentive to remarriage. A veteran's surviving spouse would be able to enter into a second marriage without fear of economic deprivation, and the elderly couple would be permitted to live together in comfort and dignity—legally married.

Benefits for surviving spouses of military retirees through the Department of Defense's (DoD) Survivor Benefit Plan do not terminate if remarriage takes place at age 55 or thereafter. In addition, we note that Social Security survivors' benefits do not terminate if remarriage takes place at age 60 or thereafter. The proposed amendment would thus better align DIC benefits with benefits provided to surviving spouses of military retirees under DoD's Survivor Benefit Plan and to surviving spouses under the Social Security program.

This amendment is subject to the PAYGO limitations of the Omnibus Budget Reconciliation Act of 1990. If enacted, it would increase direct spending in VA benefits programs. VA estimates that enactment of this provision would result in benefit costs of $269 million for the five-year period Fiscal Year (FY) 2003 through FY 2007 and $749 million for the ten-year period FY 2003 through FY 2012.

*H.R. 2095*

The next bill I will discuss, Mr. Chairman, is H.R. 2095. This measure would reduce the VA home loan funding fee paid by Reservists to the same level at most other veterans. VA supports this proposal to eliminate the additional 0.75 percent of the loan amount currently imposed on Reservists to obtain VA housing loan benefits.

In 1992, the Congress granted VA housing loan entitlement to persons whose only military service was in the Selected Reserve (including the National Guard). To be eligible for these benefits, Reservists must have completed 6 years of honorable service in the Selected Reserve, or have been released earlier for a service-connected disability. Entitlement for Reservists sunsets September 30, 2009. In most cases, Reservists pay a funding fee that is 0.75 percent higher than the fee charged veterans who served on extended active duty. For example, Reservists who have never used VA housing benefits before would pay a 2.75 percent fee to obtain a no-down-payment loan to purchase a home. Generally, veterans with qualifying active duty would pay a 2 percent fee to obtain the same loan. Veterans entitled to compensation for service-connected disabilities are exempt from the fee.

Under H.R. 2095, Reservists would pay the same fee currently charged other veterans.

In recent years, there has been an increased emphasis on the use of Reservists as part of the Armed Forces actively employed for national defense. Many members of the Reserves and National Guard were activated following the terrorist attacks of September 11, 2001. They have played and continue to play a vital role in support of our active forces and in homeland security. In addition, Reservists have been deployed to other trouble spots around the world such as Bosnia, Kosovo, and the Persian Gulf. In recognition of the importance of the Selected Reserve to our current defense efforts, VA supports this measure.

VA estimates that enactment of H.R. 2095 would result in PAYGO costs of approximately $3.27 million in the first year and approximately $32.66 million through FY 2009.

*H.R. 2222*

Mr. Chairman, VA supports the enactment of H.R. 2222. This bill would make improvements to various life insurance programs for veterans. The bill's estimated PAYGO costs are $93.9 million over five years.

Section 2 of H.R. 2222 would authorize the payment of unclaimed National Service Life Insurance (NSLI) and United States Government Life Insurance (USGLI) proceeds to an alternate beneficiary.

Under current law, there is no time limitation under which a named beneficiary of an NSLI or USGLI policy is required to file a claim for proceeds. Consequently, when the insured dies and the beneficiary does not file a claim for the proceeds, VA is required to hold the unclaimed funds indefinitely in order to honor any possible future claims by the beneficiary. VA holds the proceeds as a liability. While extensive efforts are made to locate and pay these individuals, there are cases where the beneficiary simply cannot be found. Under current law, we are not permitted to pay the proceeds to a contingent or alternate beneficiary unless we can determine that the principal beneficiary predeceased the policyholder. Consequently, payment of the proceeds to other beneficiaries is withheld.

A majority of the existing liabilities of unclaimed proceeds were established over ten years ago. As time passes, the likelihood of locating and paying the principal beneficiary becomes more remote. In fact, the older the liability becomes, the more unlikely it is that it will ever be paid even though other legitimate heirs of the insured have been located.

Section 2 of H.R. 2222 would grant the Secretary authority to authorize payment of NSLI and USGLI proceeds to an alternate beneficiary when the proceeds have

not been claimed by the named beneficiary within two years following the death of the policyholder or within two years of this bill's enactment, whichever is later. The principal beneficiary would have two years following the death of the insured to file a claim. Afterwards, a contingent beneficiary would then have two years to file a claim. Payment would be made as if the principal beneficiary had predeceased the insured. If there were no contingent beneficiary to receive the proceeds, payment would be made to those equitably entitled, as determined by the Secretary. As occurs under current law, no payment would be made if payment would escheat to a State. Such payment would be a bar to recovery of the proceeds by any other individual.

Section 2 of the bill would apply retroactively as well as prospectively, and is similar to the time-limitation provisions of the Servicemembers' and Veterans' Group Life Insurance programs and the Federal Employees Group Life Insurance program.

Insofar as payment to beneficiaries is made from the insurance trust funds, there are no direct appropriated benefit costs associated with this section of the bill. The liabilities are already set aside and would eventually be paid, either as payment to beneficiaries that eventually claim the proceeds, or released from liability reserves and paid as dividends.

There are approximately 4,000 existing policies in which payment has not been made due to the fact that we cannot locate the primary beneficiary, despite extensive efforts. Over the years, the sum of moneys held has aggregated to approximately $23 million. On a yearly basis, about 200 additional policies (with an average face value of $9600, or approximately $1.9 million annually) are placed into this liability because the law prohibits payment to a contingent beneficiary or to the veteran's heirs. It is estimated that approximately two-thirds of the 4,000 policies will eventually be paid as a result of this legislation. Additionally, in anticipation of the fact that VA will not be able to pay about one-third of these policies, nearly $7 million has already been released to surplus and made available for dividend distribution.

VA estimates that the enactment of this section would result in PAYGO costs of $15 million during FYs 2003–2007 and a total of $25 million during FYs 2003–2012.

Adjudication of these 4,000 policies would entail administrative costs of approximately $154,000, representing two full-time employee equivalence (FTE) in claims processing and support. Approximately 94 percent of this cost would be reimbursed to the Veterans Benefits Administration's General Operating Expense (GOE) account from the surplus of the trust funds, leaving about $9,000 in government costs (which assumes that about six percent of the policies are Service-Disabled Veterans Insurance, which has no surplus and for which appropriated funds are used to cover administrative costs).

Section 3 of H.R. 2222 would reduce the premium rates for Service-Disabled Veterans Insurance (S–DVI) by prospectively changing the mortality table upon which premiums are based. The S–DVI program was intended to provide service-disabled veterans with the ability to purchase insurance coverage at "standard" premium rates. S–DVI premiums are currently based on an old mortality table, i.e., the 1941 Commissioners Standard Ordinary (CSO) Mortality Table with 2.25 percent interest. In 1951, when this program began, these premium rates were competitive with commercial insurance policy rates. Insofar as life expectancy has significantly improved over the past fifty years, a more recent mortality table would reflect lower mortality and, hence, lower premium rates. Section 3 would provide that S–DVI premiums be based on the 1980 CSO Basic Mortality Table with an interest rate of five percent. While just changing to a more recent mortality table would assist new entrants into the program, it would not render any assistance to those already insured under the program unless the new mortality table, with its inherent lower premiums, was made available to them also.

Section 3 of this bill would provide service-connected disabled veterans parity with the average American's ability to purchase adequate amounts of life insurance at competitive rates. This section of H.R. 2222 would ensure that service-connected disabled veterans have the ability to obtain life insurance at standard premium rates without regard to their physical disabilities. Our goal is to provide insurance protection to veterans who have lost their ability to purchase commercial insurance at standard (healthy) rates because of their service-connected disabilities. Participants receive a subsidy equal to the difference between the premiums they pay—which account for age but not disabilities—and the actual cost of coverage.

VA estimates that the enactment of section 3 of H.R. 2222 would result in PAYGO costs of $66 million during FY 2003–2007 and a total of $150.7 million during FYs 2003–2012.

Section 4 of H.R. 2222 would increase the maximum coverage under the Veterans' Mortgage Life Insurance (VMLI) program to $200,000. VMLI provides mortgage life insurance coverage to certain severely service-disabled veterans who have received

specially-adapted housing grants from VA. The insurance is intended to pay off the outstanding balance of the mortgage in the event of the veteran's death. The current maximum amount of VMLI allowed an eligible veteran is $90,000.

The maximum amount of mortgage life insurance was last increased on December 1, 1992, when it was raised from $40,000 to $90,000. This resulted in the VMLI program covering a high percentage (91 percent) of the total mortgage balances that these severely disabled veterans held. With the increase in housing costs over the past nine years, the percentage of total mortgage balances covered has decreased significantly.

As of the start of this fiscal year, the VMLI program was providing $201 million of coverage while the outstanding mortgage balances for these veterans totaled $255 million. The coverage percentage has declined from 91 percent to 79 percent. This points to the inadequacy of the VMLI current maximum of $90,000. If the maximum coverage amount were increased to $200,000, the program would cover 98 percent of the total mortgage balances outstanding. The need for the increase is even more compelling if viewed from the perspective of the number of veterans in the VMLI program who have their entire mortgage balances insured. At the current level of $90,000, only 62 percent of participants have their entire mortgage balance covered. This means that in 38 percent of the cases, if the veteran died, the survivors would still have mortgages remaining on their homes. If the maximum were raised to $200,000, 98 percent of participants would be able to have their mortgages fully covered.

The VMLI program is subsidized with appropriated funds since these veterans are charged standard premium rates. An increase in the maximum coverage amount to $200,000 would affect 1,286 of the 3,385 veterans covered by the program. While the premiums charged these veterans would increase, the subsidy required from the government would also rise. A consulting team of Systems Flow, Economic Systems, Macro International, and Hay Group recently completed a Program Evaluation of Benefits for Survivors of Veterans with Service-Connected Disabilities, and many of the provisions of the proposed bill, including the provisions of this section, are consistent with the recommendations of that evaluation.

VA estimates that the enactment of section 4 of H.R. 2222 would result in PAYGO costs of $10.8 million during FYs 2003–2007 and a total of $28.4 million during FYs 2003–2012.

Section 5 of H.R. 2222 would provide that Veterans' Mortgage Life Insurance (VMLI) may be carried by the insured beyond age 70, but would limit new issues to ages 69 and below. These policy provisions are fairly comparable to those of commercial life insurance policies, except for the VMLI provision that coverage terminates at age 70. As part of the Program Evaluation of Benefits for Survivors of Veterans with Service-Connected Disabilities, the contracting company, Systems Flow, compiled a report, "VA Insurance and DIC Programs—Profile of Users and Non-Users and Beneficiaries," of the VA insurance and DIC programs. This report included a finding that, among users whose VMLI insurance was terminated, 12 percent of them had their insurance terminated due to their reaching age 70. Because of such terminations, VA is not providing financial security to the veterans' families.

Insofar as premium income for the VMLI program only covers about 25 percent of claims costs, this is a relatively heavily subsidized program. However, since it is only open to a small group of veterans (those eligible for specially-adapted housing), the increase in the subsidy to allow coverage past age 70 is relatively nominal. The provisions of this section are consistent with the recommendations of the before-mentioned Program Evaluation Report.

VA estimates that the enactment of section 5 of H.R. 2222 would result in PAYGO costs of $2.1 million during FYs 2003–2007 and a total of $5.3 million during FYs 2003–2012.

### *H.R. 3731*

The final bill I will be discussing today, Mr. Chairman, is H.R. 3731. This bill provides for an increase in the annual limit on funds available to compensate State approving agencies (SAA's) for work undertaken on behalf of VA, including approving educational institutions and programs for which veterans and other entitled participants receive VA-administered education benefits. VA supports this bill.

H.R. 3731 would increase the annual limit on funds available to compensate SAA's from $14,000,000 in FY 2002 to $18,000,000 in FY 2003. The amounts for FYs 2004 and 2005 would increase by 3 percent each year ($18,540,000 in 2004, $19,096,000 in 2005). Funding for FY 2006 and each succeeding fiscal year would remain fixed at the FY 2005 level. (If there is no change to the current law, the $14,000,000 level of funding will revert to $13,000,000 for FY 2003 and thereafter.) This bill also specifies that the various SAAs would receive the same proportion of

payments under the newly allocated funding limits as they would receive if those funding limits did not exist.

Because of the cost-of-living pay increases mandated by State law, salaries for State employees have gone up since the last SAA funding increase in 1994. Additionally, over the last two years, the SAAs have been called upon to perform new and time-consuming duties as part of their mission. For example, Public Law 106–419, enacted on November 1, 2000, initiated the licensing and certification test payment program and allowed VA to delegate the approval responsibility under the program to the SAAs. The SAAs accepted this additional responsibility even though it was not covered in their contracts.

In recent years, a number of SAAs have worked closely with private industry and State and local governments to encourage placement of veterans in apprenticeship and on-job training programs. However, many other SAAs that wanted to do more outreach could not do so due to a lack of resources. Now, newly-enacted Public Law 107–103 requires SAAs, in addition to VA, to actively promote the development of VA programs of on-job training (including apprenticeship programs). Furthermore, that law requires SAAs to conduct outreach programs and provide outreach services to eligible persons and veterans about education and training benefits available under applicable Federal and State laws. Clearly, increased funding is needed to enable the SAAs to carry out these additional duties effectively.

VA estimates that enactment of this provision would result in PAYGO costs of $5 million for FY 2003, $29 million for the five-year period FY 2003 through FY 2007, and $59 million for the ten-year period FY 2003 through FY 2012.

Thank you, Mr. Chairman. I will be pleased to answer any questions you or other members of the Subcommittee may have.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

The following letter was received from the Congressional Budget Office concerning the cost of the reported bill:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, May 13, 2002.*

Hon. CHRISTOPHER H. SMITH
*Chairman, Committee on Veterans' Affairs,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 4085, the Veterans' and Survivors' Benefits Expansion Act of 2002.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Michelle S. Patterson, who can be reached at 226–2840.

Sincerely,

DAN L. CRIPPEN,
*Director.*

Enclosure.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE
May 13, 2002

### H.R. 4085, VETERANS' AND SURVIVORS' BENEFITS EXPANSION ACT OF 2002, AS ORDERED REPORTED BY THE HOUSE COMMITTEE ON VETERANS' AFFAIRS ON MAY 9, 2002

### SUMMARY

H.R. 4085 contains provisions that would affect a range of veterans' programs, including disability compensation, dependency and indemnity compensation (DIC), housing, insurance, and readjustment benefits. CBO estimates that enacting this bill would increase direct spending by $25 million in 2003, $123 million over the

2003–2007 period, and $260 million over the 2003–2012 period. Direct spending could also increase in fiscal year 2002 should the bill be enacted before the end of this fiscal year, but CBO estimates that any such outlays would be insignificant because it takes the Department of Veterans Affairs (VA) several months to process most benefit claims.

H.R. 4085 contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act (UMRA) and would not affect the budgets of state, local, or tribal governments.

ESTIMATED COST TO THE FEDERAL GOVERNMENT

The estimated budgetary impact of H.R. 4085 is shown in the following table. This estimate assumes the legislation will be enacted by October 1, 2002. The costs of this legislation fall within budget function 700 (veterans benefits and services).

| | By Fiscal Year, in Millions of Dollars | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| **CHANGES IN DIRECT SPENDING** | | | | | |
| Dependency and Indemnity Compensation[a] | | | | | |
| Estimated Budget Authority | 13 | 15 | 16 | 18 | 19 |
| Estimated Outlays | 13 | 15 | 16 | 18 | 19 |
| Housing Loan Guaranty Fees | | | | | |
| Estimated Budget Authority | 6 | 6 | 6 | 0 | 0 |
| Estimated Outlays | 6 | 6 | 6 | 0 | 0 |
| Veterans Mortgage Life Insurance | | | | | |
| Estimated Budget Authority | 1 | 2 | 2 | 2 | 3 |
| Estimated Outlays | 1 | 2 | 2 | 2 | 3 |
| State Approving Agencies | | | | | |
| Estimated Budget Authority | 5 | 5 | 5 | 0 | 0 |
| Estimated Outlays | 5 | 5 | 5 | 0 | 0 |
| Total Changes | | | | | |
| Estimated Budget Authority | 25 | 28 | 29 | 20 | 22 |
| Estimated Outlays | 25 | 28 | 29 | 20 | 22 |

[a] H.R. 4085 also would increase DIC payments by the same COLA payable to Social Security recipients. That change would have a cost, relative to current law, but the effect is already assumed in CBO's baseline.

BASIS OF ESTIMATE

The bill would affect direct spending in several veterans' programs, including disability compensation, DIC, housing, insurance, and readjustment benefits.

*Dependency and Indemnity Compensation*

Section 3 would allow a surviving spouse who remarries after age 65 to continue receiving DIC payments. The provision would apply retroactively, allowing surviving spouses who have already remarried after age 65 to resume receiving DIC payments but only if they apply for the benefit within one year after this bill is enacted. CBO estimates that the total cost to provide DIC payments to surviving spouses who remarry over age 65 would be $13 million in 2003, $81 million over the 2003–2007 period, and $203 million over the 2003–2012 period.

Under current law, VA provides DIC payments to the surviving spouse of certain deceased veterans. If a surviving spouse remarries, DIC payments cease. Should the subsequent marriage end, ei-

ther because of divorce or death of the new spouse, DIC payments can resume. In fiscal year 2001, about 300,000 surviving spouses received such payments. CBO estimates that in that year, about 180 surviving spouses over age 65 (or about 0.06 percent of all surviving spouses receiving DIC) remarried and stopped receiving DIC payments as a result. CBO projects that, under current law, the number of remarriages would gradually increase each year as the overall population of DIC recipients increases and would exceed 260 a year by 2012.

CBO estimated the costs for three groups of surviving spouses-those over age 65 who would remarry under current law, those over age 65 who would choose not to remarry under current law but would remarry if H.R. 4085 were enacted, and those who remarried after age 65 before enactment of this bill.

*Surviving Spouses Over Age 65 Who Would Remarry Under Current Law.* CBO estimates that over the 2003–2012 period, 245 surviving spouses over age 65 would remarry each year on average under current law. Under this bill, federal spending for DIC would increase because those surviving spouses would now receive DIC payments that would have stopped under current law. The average DIC payment in fiscal year 2001 was $11,942. Such payments are adjusted annually for increases in the cost of living. After accounting for expected mortality of the remarried surviving spouses as well as their new spouses, CBO estimates that the additional cost to provide DIC payments to surviving spouses over age 65 who would remarry under current law would be $3 million in 2002, $42 million over the 2003–2007 period, and $145 million over the 2003–2012 period.

*Surviving Spouses Over Age 65 Who Would Choose Not to Remarry Under Current Law.* Under this bill, some surviving spouses over age 65 might choose to remarry who would not have done so under current law. CBO estimates there would be no additional cost to provide DIC payments to those individuals. Because those surviving spouses would choose to remain unmarried and receive DIC payments continuously under current law, providing DIC payments if they remarry would result in no additional costs to the program.

*Surviving Spouses Who Remarried After Age 65 Before Enactment of the Bill.* Section 3 also would apply retroactively, allowing surviving spouses who remarried after age 65 before enactment of this legislation to resume receiving DIC once this legislation was enacted. The bill institutes a deadline, however, that requires all those eligible to apply for this benefit within one year after the enactment date. After accounting for expected mortality of the remarried surviving spouses as well as their new spouses, CBO estimates that about 800 surviving spouses who remarried after age 65 would apply within the time limit and resume receiving DIC payments. That number represents about 30 percent of the total number of retroactive cases that CBO estimates would be eligible to reapply for DIC payments. CBO estimates that the additional cost to provide DIC payments to this population would be $10 million in 2003, $39 million over the 2003–2007 period, and $58 million over the 2003–2012 period. Such costs could obviously be much higher or lower, depending on the portion of eligible people that apply for

this retroactive benefit. Based on data provided by VA about the number of claims a full-time employee can process in a year, CBO estimates that no additional personnel would need to be hired to handle the added applications for benefits expected under this section.

*Cost-of-Living Adjustment (COLA)*

Section 2 would increase the amounts paid to veterans for disability compensation and to their survivors for DIC by the same COLA payable to Social Security recipients. The increase would take effect on December 1, 2002, and the results of the adjustment would be rounded to the next lower dollar.

The COLA that would be authorized by this bill is assumed in the baseline, pursuant to section 257 of the Balanced Budget and Emergency Deficit Control Act, and savings from rounding it down were achieved by the Balanced Budget Act of 1997 (Public Law 105–33). The authority to round down the COLA increase was extended to 2011 by the Veterans Education and Benefits Expansion Act of 2001 (Public Law 107–103). Because the COLA is assumed in the baseline, the COLA provision would have no budgetary effect relative to the baseline. Relative to current law, CBO estimates that enacting this provision would increase spending for these programs by about $295 million in 2003. (The annualized cost would be about $400 million in subsequent years.) This estimate assumes that the COLA effective on December 1, 2001, would be 1.9 percent.

*Home Loan Guaranty Fees*

Section 4 would lower certain fees paid by members of the selected reserves who use the VA home loan program for the first time over the 2003–2005 period. Under current law, reservists pay fees ranging from 2.75 percent to 2 percent of the loan amount, depending on the down payment made. The bill would lower these fees by 75 basis points to the same range used for active-duty veterans-a range of 2 percent to 1.25 percent. Based on an average loan amount of $131,000, a caseload of 6,000 loans a year, and a fee cut of 75 basis points, CBO estimates that under the bill, VA would lose collections of about $6 million a year over the 2003–2005 period. Lowering the fees would also save an average borrower roughly $980, but CBO estimates these savings would not be significant enough to encourage additional loans or larger loan amounts.

*Life Insurance Program*

Veterans Mortgage Life Insurance (VMLI) provides coverage to certain severely disabled veterans who have received grants for specially adapted housing from VA. VMLI pays off the outstanding balance of the mortgage upon the veteran's death. Under current law, the maximum coverage allowed under VMLI is $90,000. Section 5 would increase this amount to $150,000. By doing so, this provision would increase the number of veterans who have their entire mortgage balance covered by insurance from 62 percent to 90 percent. According to VA, about 3,000 veterans participate in the program. Since the premiums charged to these veterans are based on the mortality rates of comparable nondisabled individuals, the program requires a subsidy from VA to cover the costs of the

claims. While the proposed change in coverage would increase the premiums paid by the policyholders, it would also increase the amount of the subsidy required from VA. CBO used data provided by VA that compared the projected subsidies to the VMLI program if the current coverage level was maintained against the estimated subsidies needed if the coverage was expanded to $150,000. The difference represents the additional subsidy that would be required from VA. CBO estimates that enacting this provision would cost about $1 million in 2003, $8 million over the 2003–2007 period, and $19 million over the 2003–2012 period.

Section 5 also would allow veterans who already have VMLI to maintain coverage regardless of age. Under current law, VMLI coverage terminates at age 70. A recent survey conducted for VA found that 12 percent of veterans whose VMLI was terminated had their coverage terminated due to the age restriction. Based on data from VA, CBO estimates that the increased subsidy required under this provision would cost less than $1 million a year.

*State Approving Agencies*

Section 6 would increase the amount available to state approving agencies by $5 million each year in 2003, 2004, and 2005. CBO expects this change would increase direct spending by $15 million over the 2003–2005 period.

PAY-AS-YOU-GO CONSIDERATIONS

The Balanced Budget and Emergency Deficit Control Act sets up pay-as-you-go procedures for legislation affecting direct spending or receipts. The net changes in outlays that are subject to pay-as-you-go procedures are shown in the following table. For the purposes of enforcing pay-as-you-go procedures, only the effects through fiscal year 2006 are counted.

| | By Fiscal Year, in Millions of Dollars | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Changes in outlays | 0 | 25 | 27 | 29 | 20 | 22 | 24 | 25 | 27 | 29 | 32 |
| Changes in receipts | Not Applicable | | | | | | | | | | |

INTERGOVERNMENTAL AND PRIVATE-SECTOR IMPACT

H.R. 4085 contains no intergovernmental or private-sector mandates as defined in UMRA and would not affect the budgets of state, local, or tribal governments.

PREVIOUS CBO ESTIMATES

On August 14, 2001, CBO transmitted a cost estimate for H.R. 2095, the Reservist VA Home Loan Fairness Act of 2001, as introduced on June 7, 2001. Section 4 of H.R. 4085 is similar to H.R. 2095, but H.R. 2095 would permanently lower fees paid by reservists and would have higher costs.

On February 28, 2002, CBO transmitted a cost estimate for H.R. 2222, the Veterans Life Insurance Improvement Act of 2001, as introduced on June 19, 2001. Section 5 of H.R. 4085 is similar to sections 4 and 5 of H.R. 2222, but H.R. 2222 would increase the max-

imum coverage of VMLI to $200,000 and thus would have higher costs.

On April 19, 2002, CBO transmitted a cost estimate for H.R. 1108, as introduced on March 20, 2001. Section 3 of H.R. 4085 is similar H.R. 1108, except that the latter would provide DIC to surviving spouses who remarry after age 55. H.R. 4085 also would put a time limit on applications from surviving spouses who remarried before enactment of the bill; H.R. 1108 would not.

ESTIMATE PREPARED BY:

Federal Costs:

Veterans Compensation, DIC, and Insurance: Michelle S. Patterson

Veterans Housing: Sunita D'Monte

State Approving Agencies: Sarah Jennings

Impact on State, Local, and Tribal Governments: Elyse Goldman

Impact on the Private Sector: Sally Maxwell

ESTIMATE APPROVED BY:

Peter H. Fontaine

Deputy Assistant Director for Budget Analysis

### STATEMENT OF FEDERAL MANDATES

The preceding Congressional Budget Office cost estimate states that the bill contains no intergovernmental or private sector mandates as defined in the Unfunded Mandates Reform Act.

### STATEMENT OF CONSTITUTIONAL AUTHORITY

Pursuant to Article I, section 8 of the United States Constitution, the reported bill is authorized by Congress' power to "provide for the common Defense and general Welfare of the United States."

### CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

## TITLE 38, UNITED STATES CODE

* * * * * * *

## PART I—GENERAL PROVISIONS

* * * * * * *

## CHAPTER 1—GENERAL

* * * * * * *

**§ 103. Special provisions relating to marriages**

(a) * * *

* * * * * * *

(d)(1) * * *

(2) The remarriage of the surviving spouse of a veteran shall not bar the furnishing of benefits specified in paragraph (5) to such person as the surviving spouse of the veteran [if the remarriage has been terminated by death or divorce unless the Secretary determines that the divorce was secured through fraud or collusion.] *if—*

*(A) the remarriage occurs after the surviving spouse attains age 65 ;*

*(B) the remarriage has been terminated by death; or*

*(C) the remarriage has been terminated by divorce, unless the Secretary determines that the divorce was secured through fraud or collusion.*

* * * * * * *

(4) [The first month of eligibility for benefits for a surviving spouse by reason of this subsection shall be] *When eligibility for benefits for a surviving spouse is restored by reason of this subsection, the first month of eligibility for such benefits shall be* the month after—

(A) the month of the termination of such remarriage, in the case of a surviving spouse [described in] *with a remarriage described in subparagraph (B) or (C) of* paragraph (2); or

* * * * * * *

(5) Paragraphs (2) and (3) apply with respect to benefits under the following provisions of this title:

[(A) Section 1311, relating to dependency and indemnity compensation.]

*(A) Sections 1121 and 1311, relating to death compensation and dependency and indemnity compensation, respectively.*

* * * * * * *

## PART II—GENERAL BENEFITS

* * * * * * *

### CHAPTER 13—DEPENDENCY AND INDEMNITY COMPENSATION FOR SERVICE-CONNECTED DEATHS

* * * * * * *

### SUBCHAPTER II—DEPENDENCY AND INDEMNITY COMPENSATION

* * * * * * *

**§ 1311. Dependency and indemnity compensation to a surviving spouse**

(a) * * *

* * * * * * *

*(e) In the case of an individual who is eligible for dependency and indemnity compensation under this section by reason of section 103(d)(2)(A) of this title who is also eligible for benefits under another provision of law by reason of such individual's status as the surviving spouse of a veteran, then, notwithstanding any other pro-*

*vision of law, no reduction in benefits under such other provision of law shall be made by reason of such individual's eligibility for benefits under this section.*

* * * * * * *

## CHAPTER 21—SPECIALLY ADAPTED HOUSING FOR DISABLED VETERANS

* * * * * * *

### § 2106. Veterans' mortgage life insurance

(a) The United States shall automatically insure any eligible veteran *age 69 or younger* who is or has been granted assistance in securing a suitable housing unit under this chapter against the death of the veteran unless the veteran (1) submits to the Secretary in writing the veterans' election not to be insured under this section, or (2) fails to respond in a timely manner to a request from the Secretary for information on which the premium for such insurance can be based.

(b) The amount of insurance provided a veteran under this section may not exceed the lesser of **[**$90,000**]** *$150,000* or the amount of the loan outstanding on the housing unit. The amount of such insurance shall be reduced according to the amortization schedule of the loan and may not at any time exceed the amount of the outstanding loan with interest. If there is no outstanding loan on the housing unit, insurance is not payable under this section. If an eligible veteran elects not to be insured under this section, the veteran may thereafter be insured under this section, but only upon submission of an application, payment of required premiums, and compliance with such health requirements and other terms and conditions as may be prescribed by the Secretary.

* * * * * * *

(i) Insurance under this section shall terminate upon whichever of the following events first occurs:

(1) * * *

**[**(2) The veteran's seventieth birthday.**]**

**[**(3)**]** *(2)* Termination of the veteran's ownership of the property securing the loan.

**[**(4)**]** *(3)* Discontinuance of payment of premiums by the veteran.

* * * * * * *

# PART III—READJUSTMENT AND RELATED BENEFITS

* * * * * * *

## CHAPTER 36—ADMINISTRATION OF EDUCATIONAL BENEFITS

* * * * * * *

### SUBCHAPTER I—STATE APPROVING AGENCIES

* * * * * * *

**§ 3674. Reimbursement of expenses**

(a)(1) * * *

* * * * * * *

(4) The total amount made available under this section for any fiscal year may not exceed $13,000,000 or, for each of fiscal years 2001 and 2002, $14,000,000, *and for each of fiscal years 2003, 2004, and 2005, $18,000,000*. For any fiscal year in which the total amount that would be made available under this section would exceed the amount applicable to that fiscal year under the preceding sentence except for the provisions of this paragraph, the Secretary shall provide that each agency shall receive the same percentage of the amount applicable to that fiscal year under the preceding sentence as the agency would have received of the total amount that would have been made available without the limitation of this paragraph.

* * * * * * *

## CHAPTER 37—HOUSING AND SMALL BUSINESS LOANS

* * * * * * *

### SUBCHAPTER III—ADMINISTRATIVE PROVISIONS

* * * * * * *

**§ 3729. Loan fee**

(a) * * *

(b) DETERMINATION OF FEE.—(1) * * *

(2)*(A)* The loan fee table referred to in paragraph (1) *for any loan closed after September 30, 2005* is as follows:

LOAN FEE TABLE

| Type of loan | Active duty veteran | Reservist | Other obligor |
|---|---|---|---|
| (A)(i) Initial loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other initial loan described in section 3710(a) other than with 5-down or 10-down (closed before October 1, 2011) | 2.00 | 2.75 | NA |
| (A)(ii) Initial loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other initial loan described in section 3710(a) other than with 5-down or 10-down (closed on or after October 1, 2011) | 1.25 | 2.00 | NA |
| (B)(i) Subsequent loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other subsequent loan described in section 3710(a) (closed before October 1, 2011) | 3.00 | 3.00 | NA |
| (B)(ii) Subsequent loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other subsequent loan described in section 3710(a) (closed on or after October 1, 2011) | 1.25 | 2.00 | NA |
| (C)(i) Loan described in section 3710(a) to purchase or construct a dwelling with 5-down (closed before October 1, 2011) | 1.50 | 2.25 | NA |

LOAN FEE TABLE—Continued

| Type of loan | Active duty veteran | Reservist | Other obligor |
|---|---|---|---|
| (C)(ii) Loan described in section 3710(a) to purchase or construct a dwelling with 5-down (closed on or after October 1, 2011) | 0.75 | 1.50 | NA |
| (D)(i) Initial loan described in section 3710(a) to purchase or construct a dwelling with 10-down (closed before October 1, 2011) | 1.25 | 2.00 | NA |
| (D)(ii) Initial loan described in section 3710(a) to purchase or construct a dwelling with 10-down (closed on or after October 1, 2011) | 0.50 | 1.25 | NA |
| (E) Interest rate reduction refinancing loan | 0.50 | 0.50 | NA |
| (F) Direct loan under section 3711 | 1.00 | 1.00 | NA |
| (G) Manufactured home loan under section 3712 (other than an interest rate reduction refinancing loan) | 1.00 | 1.00 | NA |
| (H) Loan to Native American veteran under section 3762 (other than an interest rate reduction refinancing loan) | 1.25 | 1.25 | NA |
| (I) Loan assumption under section 3714 | 0.50 | 0.50 | 0.50 |
| (J) Loan under section 3733(a) | 2.25 | 2.25 | 2.25 |

*(B) The loan fee table referred to in paragraph (1) for any loan closed during the period beginning on October 1, 2002, and ending on September 30, 2005, is as follows:*

*LOAN FEE TABLE*

| *Type of loan* | *Veteran* | *Other obligor* |
|---|---|---|
| *(A)(i) Initial loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other initial loan described in section 3710(a) other than with 5-down or 10-down (closed before October 1, 2008)* | *2.00* | *NA* |
| *(A)(ii) Initial loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other initial loan described in section 3710(a) other than with 5-down or 10-down (closed on or after October 1, 2008)* | *1.25* | *NA* |
| *(B)(i) Subsequent loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other subsequent loan described in section 3710(a) (closed before October 1, 2008)* | *3.00* | *NA* |
| *(B)(ii) Subsequent loan described in section 3710(a) to purchase or construct a dwelling with 0-down, or any other subsequent loan described in section 3710(a) (closed on or after October 1, 2008)* | *1.25* | *NA* |
| *(C)(i) Loan described in section 3710(a) to purchase or construct a dwelling with 5-down (closed before October 1, 2008)* | *1.50* | *NA* |
| *(C)(ii) Loan described in section 3710(a) to purchase or construct a dwelling with 5-down (closed on or after October 1, 2008)* | *0.75* | *NA* |
| *(D)(i) Initial loan described in section 3710(a) to purchase or construct a dwelling with 10-down (closed before October 1, 2008)* | *1.25* | *NA* |

*LOAN FEE TABLE—Continued*

| *Type of loan* | *Veteran* | *Other obligor* |
|---|---|---|
| *(D)(ii) Initial loan described in section 3710(a) to purchase or construct a dwelling with 10-down (closed on or after October 1, 2008)* | *0.50* | *NA* |
| *(E) Interest rate reduction refinancing loan* | *0.50* | *NA* |
| *(F) Direct loan under section 3711* | *1.00* | *NA* |
| *(G) Manufactured home loan under section 3712 (other than an interest rate reduction refinancing loan)* | *1.00* | *NA* |
| *(H) Loan to Native American veteran under section 3762 (other than an interest rate reduction refinancing loan)* | *1.25* | *NA* |
| *(I) Loan assumption under section 3714* | *0.50* | *0.50* |
| *(J) Loan under section 3733(a)* | *2.25* | *2.25* |

* * * * * * *

(4) For the purposes of paragraph (2):

(A) The term "active duty veteran" means any veteran eligible for the benefits of this chapter other than a Reservist, *and the term "veteran" means any veteran eligible for the benefits of this chapter.*

* * * * * * *

○