pensates veterans who served in the Republic of Vietnam during the Vietnam era and suffered disability as a result of that exposure. Because of the "concern and apprehension among veterans regarding the health effects of herbicides," Congress mandated an epidemiologic study by VA of the effects of exposure to dioxin in the Veterans Health Programs Extension and Improvement Act of 1979. Congress also required VA to review and scientifically analyze literature relating to possible long-term health effects of human exposure to dioxin. In 1981, Congress authorized VA to provide hospital and nursing home care to certain veterans exposed during service to dioxin or ionizing radiation for conditions which, although not shown to have resulted from such exposure, are not found to have resulted from a cause other than such exposure. The Veterans' Dioxin and Radiation Exposure Compensation Standards Act of 1984 directed VA to issue regulations to establish guidelines and, where appropriate, standards and criteria for the resolution of benefit claims based on exposure to herbicides containing dioxin in service in the Republic of Vietnam during the Vietnam era. The act also required VA to make specific findings, either positive or negative, regarding service connection as to three diseases, chloracne, porphyria cutanea tarda, and soft-tissue sarcoma.

In 1991, Congress added section 1116 (formerly section 316) to title 38, United States Code, establishing a presumption of service connection, applicable to veterans who served in the Republic of Vietnam during the Vietnam era, for three diseases. The act also called for VA to contract with the National Academy of Sciences to perform a review and evaluation of the scientific evidence regarding the association between disease and exposure to herbicides used in connection with the Vietnam War and each disease suspected of association with such exposure. Congress amended section 1116 in 1994 and 2001 by adding five conditions to the list of diseases presumed to be service connected in Vietnam veterans.

More recently, Congress has enacted legislation to provide a monetary allowance and other benefits to the children of Vietnam veterans who were born with spina bifida, as well as to children with certain other birth defects who are the natural children of women veterans who served in the Republic of Vietnam during the Vietnam era.

Congress' legislative enactments indicate its recognition of the unique circumstances of service in Vietnam-circumstances including the special sacrifices made by veterans of that war, and the great uncertainties regarding exposures of individual veterans to aerially applied herbicides. H.R. 533 would extend benefits Congress bestowed upon the affected children of those veterans to children of veterans who did not serve under those circumstances. In addition, H.R. 533's language is so vague as to be almost impossible to administer. Under that language, an individual would be considered to have performed "qualifying herbicide-risk service" if he or she, while performing active service, "served in an area in which a Vietnam-era herbicide agent was used during a period when such agent was used in that area." The vagueness of the terms "area," "was used," and "during a period when" is sure to generate substantial litigation over what Congress intended by this language.

VA estimates that enactment of H.R. 533 would result in direct costs of $60.8 million in FY 2004 and $760.7 million over the ten-year period FY 2004–2013. In addition, VA estimates administrative costs of $357,000 for FY 2004 and $ 1.73 million for the ten-year period FY 2004–2013.

* * * * * * *

H.R. 1048

*Specially Adapted Housing*

The other Specially Adapted Housing proposal is contained in section 2 of H.R. 1048, the "Disabled Veterans Adaptive Benefits Improvement Act of 2003." This section would increase the maximum Specially Adapted Housing grants. VA favors such increases, provided offsetting savings may be found.

Under H.R. 1048, the maximum Specially Adapted Housing grant authorized by section 2101(a) would be increased from $48,000 to $50,000. In addition, the maximum Special Housing Adaptations grant authorized by section 2101(b) would be increased from $9,250 to $10,000. These grants were last increased by Public Law 107–103, enacted December 27, 2001.

VA estimates that approximately 600 veterans per year will receive specially adapted housing assistance, of which about 92.5 percent will qualify for the grant authorized by section 2101(a). VA estimates the cost of enacting section 2 of H.R. 1048 would be $1.14 million per year, with a total 10-year cost of $11.4 million.

*Assistance for Automobile and Adaptive Equipment*

Section 3 of H.R. 1048 would increase from $9,000 to $11,000 the maximum amount that VA may pay under 38 U.S.C. § 3902(a) to provide or assist in providing an automobile or other conveyance to eligible persons.

The maximum automobile allowance was also last increased to the current $9,000 on December 27, 2001.

VA estimates the total benefits cost of both provisions of H.R. 1048 would be $3.3 million for FY 2004 and $33.3 million for the ten-year period FY 2004–2013. Because these benefits were last increased just 16 months ago, and these costs are not included in the President's budget request, we are unable to support enactment of H.R. 1048. However, we will remain vigilant and recommend increases if there is a significant erosion in the value of these benefits due to inflation.

* * * * * * *

**H.R. 966**

Mr. Chairman, H.R. 966, the "Disabled Veterans' Return-to-Work Act of 2003," would amend provisions of 38 U.S.C. § 1524 to reinstate a program of vocational training for certain pension recipients that was in place between February 1, 1985, and December 31, 1995. That temporary program, established pursuant to the Veterans' Benefits Improvement Act of 1984, Pub. L. No. 98–543, required the Secretary of Veterans Affairs to determine whether the achievement of a vocational goal was reasonably feasible in the case of certain veterans awarded pension during the program period. If the achievement of such a goal was found to be feasible, these veterans were offered the opportunity to pursue programs of vocational training consisting of vocationally oriented and other services and assistance of the same kind provided under the vocational rehabilitation program authorized under chapter 31 of title 38, United States Code. These services and assistance did not include subsistence allowances, loans, or automobile adaptive equipment. Once a program of training was completed, a veteran could also receive employment assistance. The law limited the number of evaluations to be performed to not more than 3,500 veterans during any 12-month period. The initial program period ran from February 1, 1985, to January 31, 1992.

Initially, the law required that a veteran under the age of 50 who was awarded pension during the program period be evaluated with respect to his or her potential for rehabilitation. It required that the evaluation include a personal interview by a VA employee trained in vocational counseling. If the veteran refused to participate in the evaluation, his or her pension was suspended until he or she participated in an evaluation. Subsequent participation in the vocational training itself was voluntary. For a veteran pension recipient 50 years of age or older, the program of vocational training was totally voluntary. If, upon application by such a veteran-pensioner, VA made a preliminary finding on the basis of information in the application that, with the assistance of a vocational training program, the veteran had good potential for achieving employment, VA was authorized, upon the veteran's request, to evaluate the veteran to further determine whether the achievement of a vocational goal was reasonably feasible.In 1992, Public Law 102–562 eliminated the limitation on the number of program participants who may be evaluated annually and amended the program for veterans under age 45, rather than under age 50, who were awarded pension during the program period so as to (A) require the Secretary, based on information on file with VA, to make a preliminary finding whether the veteran, with the assistance of a VA vocational training program, had a good potential for achieving employment; (B) if that potential was found to exist, required the Secretary to solicit from the veteran an application for VA vocational training; and (C) if the veteran applied for training, required the Secretary to provide an evaluation to determine whether the achievement of a vocational goal was reasonably feasible. In addition, the program was opened to veterans age 45 and older who had been awarded pension before the program period. That Public Law also extended the program ending date until December 31, 1995. No further action was taken by Congress, and by operation of law, the program ended on December 31, 1995.

During the period February 1, 1985, through January 31, 1989, VA evaluated approximately 9,468 veterans under the program. Of these, 2,838 were found to be feasible for training. Some 468 veterans participated in programs of vocational training. Sixty-five veterans completed that training. Fifty-eight obtained employment. Between fiscal year 1989 and fiscal year 1992, VA conducted 9,140 evaluations under the program, with 937 veterans participating in training.

H.R. 966 would reinstate the program and provide that a new program period would run for five years beginning on the date of enactment of the Act. In addition, it would require the Secretary to ensure that the availability of vocational training under section 1524 be made known through a variety of means, including the Inter-

net and announcements in VA publications and other veterans' publications. Finally, the bill would require the Secretary, within two years after the date of enactment of the Act, to report to the Committees on Veterans' Affairs of the Senate and House on the operation of the program to include an evaluation of the vocational training provided and an analysis of the cost-effectiveness of the training provided, as well as data on the entered-employment rate of veterans pursuing such training.

If H.R. 966 were to be enacted, we estimate that VA would conduct approximately 1,300 record reviews each year, based on new accessions to the pension rolls, to determine whether each veteran so evaluated has good potential for achieving employment. We estimate that the achievement of a vocational goal will be determined to be feasible in about ⅓ (433) of those cases. Of that number, it is estimated that approximately ⅓ of these, 144 veterans, will actually end up participating in the program. In addition, because the program is also available to veterans over age 45 on a voluntary basis, we estimate that an additional 25 participants may participate, for a total of 169 cases per year. Based on those numbers, VA estimates that the enactment of H.R. 966 would cost $3 million for fiscal years 2004 through 2008 and an additional $3.6 million for fiscal years 2009 though 2013, totaling $6.6 million.

Mr. Chairman, given our experience in administering the temporary program during its ten-year duration, and the fact that only a small number of veterans benefited from the program, VA believes that the finite resources available to us for program administration would be best used to support our current program of vocational rehabilitation for service-disabled veterans, as authorized under chapter 31 of title 38, United States Code. Thus, the Department does not support the enactment of H.R. 966.

Mr. Chairman, this concludes my statement. I will be pleased to respond to any questions you or the members of the Subcommittee may have.

---

*Statement of Robert J. Epley, Associate Deputy Under Secretary for Policy and Program Management, Veterans Benefits Administration, Department of Veterans Affairs, Before the House Committee on Veterans' Affairs, Subcommittee on Benefits, June 11, 2003*

Mr. Chairman and Members of the Subcommittee, thank you for the opportunity to testify today on several legislative items of interest to veterans. Accompanying me today is John H. Thompson, Deputy General Counsel.

* * * * * * *

**H.R. 1167**

H.R. 1167 would allow a veteran's surviving spouse who marries a non-veteran after the veteran's death to be eligible for burial in a VA national cemetery based on his or her marriage to the veteran. This proposal is similar to a VA proposal sent to Congress on April 25, 2003.Over the last several years, the National Cemetery Administration has seen an increase in the number of requests for burial of a veteran's widow or widower who married a non-veteran after the veteran died. These cases usually involve spouses of veterans who were married for many years and raised a family with the veteran. Typically, the veteran's children and grandchildren, and often the current spouse, support the burial of the decedent with the original veteran-spouse in a VA national cemetery. However, current law does not permit it if the remarriage remained in effect when the veteran's survivor predeceased the new spouse.

Public Law 103–446 revised eligibility criteria for burial in a national cemetery to reinstate burial eligibility for a surviving spouse of an eligible veteran whose subsequent remarriage to a non-veteran was terminated by death or dissolved by divorce. The current proposal would be consistent with that amendment in further acknowledging the importance of that marriage to the veteran's family. This proposal would allow the deceased veteran to be buried with a spouse with whom he or she always expected to be buried. It would also allow the veteran's children to visit a single gravesite to pay their respects to their parents.

We estimate that the cost associated with this proposal would be minimal. The average number of requests for burials for individuals previously married to an eligible veteran who subsequently married a non-veteran is estimated to be 200 per year; the majority of these burials would be second interments. The cost of a second interment (including a headstone or marker) in a VA national cemetery averages approximately $550. For FY 2004, we anticipate the mandatory cost of the proposal to be $20,000 for the provision of headstones or markers and the discretionary costs to be $90,000 for operational activities. Our ten-year estimate (FY 2004–2013) is

$200,000 in mandatory costs and $900,000 in discretionary costs.This bill makes the eligibility for burial of remarried surviving spouses of veterans retroactive to January 1, 2000. We estimate that the costs associated with the retroactivity of this bill would be negligible. While it is difficult to determine how many families of already deceased, and presumably interred, remarried surviving spouses of veterans would want to disinter their loved one and then re-inter them with the veteran in a national cemetery, we do not believe this number would be significant.

* * * * * * *

### H.R. 2164

H.R. 2164 would amend 38 U.S.C. § 3512, effective September 1, 2001, to provide that individuals who qualify for benefits under chapter 35 (survivors' and dependents' educational assistance) and are involuntarily ordered to full-time National Guard duty under 32 U.S.C. § 502(f) after September 11, 2001, would have their individual delimiting dates extended by an amount of time equal to that period of active duty plus 4 months. Public Law 107–103 restored entitlement to National Guard personnel who qualified for chapter 35 benefits who had to discontinue course pursuit as a result of being called to active duty under specific sections of title 10, United States Code. This bill would provide the same delimiting date extension to National Guard members who are activated under title 32. The proposal is nearly identical to a VA proposal transmitted to Congress on April 25, 2003. Thus, VA strongly supports the bill.

We estimate the cost associated with the enactment of H.R. 2164 would be $150,000 for FY 2004 and approximately $5 million in mandatory funding for the ten-year period from FY 2004 through FY 2013.

### H.R. 2285

H.R. 2285 would amend title 38, United States Code, to require the Secretary of Labor to provide staffing at military installations overseas to carry out Transition Assistance Program (TAP) counseling within 90 days after the date of enactment of the Act. While VA strongly supports initiatives that would further enhance TAP, we respectfully defer to the views of the Department of Labor regarding the merits of this bill.

### H.R. 2297

H.R. 2297 would amend title 38, United States Code, to expand MGIB benefits to certain self-employment training, to extend the Veterans' Advisory Committee on Education until 2009, to repeal the VA education loan program, to provide permanent authority for state cemetery grants, to provide for forfeiture of VA benefits for certain subversive activities, and to extend VA's authority to maintain a regional office in the Philippines through 2005. H.R. 2297 incorporates with some changes certain provisions of VA draft bills sent to Congress on April 25, 2003, and May 12, 2003.

Section 1 of the bill would expand the Montgomery GI Bill (chapter 30) program by authorizing educational assistance benefits for veterans under that program for on-job training in certain self-employment training programs. Such training might, for example, include that necessary for operation of a franchise. The Veterans Entrepreneurship and Small Business Development Act of 1999 (Pub. L. No. 106–50) requires that all Federal agencies aggressively support self employment for veterans and service-disabled veterans, directly and through public or private partnerships. This amendment would provide veterans considering self employment with improved access to capital for training. Thus, more veterans would be encouraged to initiate steps toward self employment. The proposal is nearly identical to a VA proposal transmitted to Congress on April 25, 2003. Accordingly, we strongly support its enactment.

We estimate the costs associated with the enactment of this section would be $357,000 for FY 2004 and approximately $3.9 million in mandatory funding for the 10-year period from FY 2004 through FY 2013.

Section 2 of the bill would extend to the year 2009 the Veterans' Advisory Committee on Education and amend pertinent law requiring the inclusion of veterans from World War II, the Korean Conflict era and the post-Korean conflict era as members of the Committee. The Committee is useful in keeping the Secretary in touch with the education community as well as the veterans' service organizations. During the last several years, the Committee has made a number of recommendations that have, in turn, become legislative proposals. The Committee's discussions and recommendations are an invaluable aid to our efforts in administering VA's education programs. The proposal is nearly identical to a VA proposal transmitted

to Congress on April 25, 2003; however, we favor extending the authority for the Committee until 2013.

We estimate the costs associated with the extension of the Committee would be $25,400 for FY 2004 and $200,000 in discretionary funding for the 10-year period from FY 2004 through FY 2013.

Section 3 of the bill would repeal the VA education loan program and waive any existing repayment obligations, to include overpayments due to default on such loans. The program, in effect since January 1, 1975, currently is available to issue loans up to a maximum of $2,500 per academic year to spouses and surviving spouses of veterans who are past their delimiting dates with remaining entitlement to chapter 35 benefits. The population for this program is very limited, and, with other options in the public and private sectors, there is no longer a demand for these loans. In fact, VA has not issued a loan under this program in several years, but the Government has paid an estimated $70,000 a year to administer it. VA's October 2002 monthly loans statistics show 20 current education loans in the amount of $14,987.08 and 116 defaulted education loans totaling $105,908.10. As is apparent, it costs VA more to administer the loan program than to forgive the debts currently outstanding. VA recommended the repeal of this program in a letter to Congress on April 25th of this year.

We estimate the cost associated with the repeal of the education loan program to be approximately $121,000 in FY 2004 in mandatory funding.

Section 4 of the bill would amend 38 U.S.C. §2408(a)(2) to permanently authorize appropriations for VA to make grants to states to assist them in establishing, expanding, or improving state veterans' cemeteries. Section 2408(a)(2) currently authorizes appropriations for making these grants through fiscal year 2004.

VA's State Cemetery Grants Program is an important component in meeting the burial needs of our Nation's veterans. State veterans' cemeteries supplement VA's national cemetery system in providing burial options to veterans throughout the Nation. VA's State Cemetery Grants Program has already helped to fund 51 operational state veterans' cemeteries, and six more are under construction. VA has received over 30 additional pre-applications from states requesting grants. There is a tremendous, on-going demand for grants to improve or expand existing state veterans' cemeteries, and permanently authorizing appropriations would assist long-term planning for this important program.

Appropriations for VA's State Home Grants Program (authorized by subchapter III of chapter 81, title 38, United States Code) are permanently authorized under 38 U.S.C. §8133(a). The amendment made by section 4 of H.R. 2297 would improve the consistency in the operation of the two programs. We support this proposal.

The costs associated with this proposal would be those included in VA's annual budget request for use in providing grants to states. The President's budget submission to Congress for FY 2004 includes a request for $32 million for the State Cemetery Grants Program.

Section 5 of the bill would amend section 6105 of title 38, United States Code, to supplement the list of offenses conviction of which would result in a bar to all gratuitous VA benefits. Section 6105 provides that an individual convicted after September 1, 1959, of any of several specified offenses involving subversive activities shall have no right to gratuitous benefits, including national cemetery burial, under laws administered by the Secretary of Veterans Affairs, and that no other person shall be entitled to such benefits on account of such individual. Congress' primary concern in enacting this provision was to prevent VA benefits from being provided based on military service of persons found guilty of offenses involving national security. This proposal would amend section 6105 to supplement the list of offenses conviction of which would result in a bar to all gratuitous VA benefits to include additional offenses that have come into being since enactment of section 6105.

This proposal would extend the current prohibition on payments of gratuitous benefits to persons convicted of subversive activities to include six additional classes of activities. The following offenses from title 18, United States Code, would be added: sections 175 (Prohibitions with respect to biological weapons); 229 (Prohibited activities with respect to chemical weapons); 831 (Prohibited transactions involving nuclear materials); 1091 (Genocide); 2332a (Use of certain weapons of mass destruction); and 2332b (Acts of terrorism transcending national boundaries). All of these offenses, which involve serious threats to national security, were added to title 18, United States Code, after the enactment of section 6105. We support this proposal.

There is no cost associated with this proposal. Cost savings would be insignificant.

Section 6 of the bill would extend until December 31, 2005, the authority of the Secretary of Veterans Affairs under 38 U.S.C. §315(b) to operate a regional office in the Republic of the Philippines. Under current law, that authority will expire on

December 31, 2003. Congress has periodically extended this authority, most recently in Public Law 106–117.

Were VA to close the Manila regional office, veterans' assistance activities would still be needed in the Philippines. A Federal Benefits Unit would have to be attached to the Department of State. Under such an arrangement, VA's control of costs and quality of service would be limited. Because a Federal Benefits Unit would assume responsibility only for disseminating information and assistance, but not processing benefits, there could be no assurance that the extensive fraud-prevention activities currently performed by the Manila regional office would continue.

We support extension of the Secretary's authority to operate a regional office in the Philippines. However, we recommend that this authority be extended through December 31, 2008.

An extension of the Secretary's authority to operate a regional office in the Philippines is included in the President's FY 2004 Budget.

We note that, while legislation under consideration at this hearing reflects several proposals recommended by VA in draft legislation submitted to Congress on April 25, 2003, and May 12, 2003, a number of other provisions of our draft bills of importance to VA and veterans were not included. In particular, our Allen-case legislation, forwarded to the Congress in April, if enacted, would put an end to a state of the law we consider unconscionable and an affront to most veterans. The same program that so fittingly compensates veterans for their service-related disabilities should not be a source of payments to veterans because they are substance abusers. Congress established the appropriate policy when it provided in 1990 that "no compensation shall be paid if [a] disability is a result of [a] veteran's own . . . abuse of alcohol or drugs." VA is a recognized leader in the treatment of substance disorders, and that is an altogether appropriate role for the Government to assume. But paying veterans for the disabling effects of their own alcohol or drug abuse obviously can be a disincentive to their treatment and recovery. As currently interpreted by the courts, the law in this regard reflects a public policy inconsistent with VA's mission. We urge your prompt enactment of our legislation.

In addition, we urge the Committee to review our draft legislative proposals dealing with alternative beneficiaries for Government life insurance, time limitations for submission of claim information, expansion of the burial plot allowance, provision of Government markers for privately marked graves, and expansion of benefits for Filipino veterans residing in the United States and incorporate these worthy initiatives into pending legislation.

## Congressional Budget Office Cost Estimate

The following letter was received from the Congressional Budget Office concerning the cost of the reported bill:

U.S. Congress,
Congressional Budget Office,
*Washington, DC, July 14, 2003*

Hon. Christopher H. Smith
*Chairman, Committee on Veterans' Affairs,*
*House of Representatives, Washington, DC*

Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 2297, the Veterans Benefits Act of 2003.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Sarah T. Jennings, who can be reached at 226–2840.

Sincerely,

Douglas Holtz-Eakin,
*Director*

Enclosure.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

*H.R. 2297, Veterans Benefits Act of 2003*

*As ordered reported by the House Committee on Veterans' Affairs on June 26, 2003*

### SUMMARY

H.R. 2297 would affect several veterans programs, including housing, compensation, pensions, burial, and education. The bill also would affect retirement programs for the military and the other uniformed services. CBO estimates that enacting this legislation would reduce direct spending for veterans programs and for uniformed services' retirement benefits by $63 million in 2004, about $135 million over the 2004–2008 period, and about $300 million over the 2004–2013 period. In addition, CBO estimates that implementing H.R. 2297 would cost $4 million in 2004 and $137 million over the 2004–2008 period, assuming appropriation of the necessary amounts.

H.R. 2297 contains no intergovernmental or private-sector mandates as defined by the Unfunded Mandates Reform Act (UMRA) and would impose no costs on state, local, or tribal governments.

### ESTIMATED COST TO THE FEDERAL GOVERNMENT

The estimated budgetary impact of H.R. 2297 is shown in Table 1. This estimate assumes that the legislation will be enacted by October 1, 2003. The costs of this legislation fall within budget functions 700 (veterans benefits and services), 600 (income security), 300 (natural resources and environment), 400 (transportation), and 550 (health).

TABLE 1. ESTIMATED BUDGETARY IMPACT OF H.R. 2297

| | By Fiscal Year, in Millions of Dollars | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 |
| **CHANGES IN DIRECT SPENDING** | | | | | |
| Estimated Budget Authority | −63 | −15 | −18 | −20 | −21 |
| Estimated Outlays | −63 | −15 | −18 | −20 | −21 |
| **CHANGES IN SPENDING SUBJECT TO APPROPRIATION** | | | | | |
| Estimated Authorization Level | 37 | 39 | 40 | 41 | 41 |
| Estimated Outlays | 4 | 21 | 31 | 39 | 40 |

[a] Five-year costs in the text differ slightly from a summation of the annual costs listed here because of rounding.

### BASIS OF ESTIMATE

*Direct Spending—Summary*

H.R. 2297 would affect direct spending in veterans' programs for housing, compensation, pension, burial, and veterans' readjustment benefits. The bill would also affect direct spending for annuities for the survivors of uniformed services' retirees. Table 2 summarizes those effects, and the individual provisions that would affect direct

spending are described below. In total, CBO estimates that enacting this legislation would decrease direct spending for veterans' programs and uniformed services retirement benefits by $63 million in 2004, about $135 million over the 2004–2008 period, and about $300 million over the 2004–2013 period.

*Direct Spending—Housing*

Three sections of the bill would affect direct spending on veterans' housing programs. Together, CBO estimates that enacting these provisions would lower direct spending by $97 million in 2004, $372 million over the 2004–2008 period, and $816 million over the 2004–2013 period (see Table 2). (Higher savings in 2004 result from lower interest rate assumptions for that year compared to those projected for the 2005–2013 period.) In preparing this estimate, CBO accounted for the interactive effects between the individual provisions; savings could be lower if only one or two of these provisions were enacted. Costs or savings for each individual provision, estimated as if they were enacted alone, are described below.

TABLE 2. ESTIMATED CHANGES IN DIRECT SPENDING UNDER H.R. 2297

| | By Fiscal Year, in Millions of Dollars | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| **HOUSING** [a] | | | | | | | | | | | |
| Spending Under Current Law .... | 452 | 567 | 552 | 535 | 547 | 560 | 572 | 588 | 601 | 917 | 938 |
| Proposed Changes .................... | 0 | −97 | −65 | −67 | −70 | −73 | −76 | −82 | −85 | −99 | −102 |
| Spending Under H.R. 2297 ........ | 452 | 470 | 487 | 468 | 477 | 487 | 496 | 506 | 516 | 818 | 836 |
| **COMPENSATION, PENSION, AND BURIAL BENEFITS** [a] | | | | | | | | | | | |
| Spending Under Current Law .... | 27,224 | 29,796 | 34,353 | 32,288 | 29,992 | 33,121 | 33,621 | 34,170 | 37,661 | 33,048 | 36,743 |
| Proposed Changes .................... | 0 | 27 | 45 | 47 | 48 | 49 | 50 | 51 | 52 | 52 | 53 |
| Spending Under H.R. 2297 ........ | 27,224 | 29,823 | 34,398 | 32,335 | 30,040 | 33,170 | 33,671 | 34,221 | 37,713 | 33,100 | 36,796 |
| **RETIREMENT BENEFITS** | | | | | | | | | | | |
| Spending Under Current Law .... | 35,740 | 36,660 | 37,649 | 38,770 | 39,929 | 41,072 | 42,130 | 43,237 | 44,323 | 45,428 | 46,553 |
| Proposed Changes .................... | 0 | 1 | −2 | −5 | −5 | −5 | −5 | −5 | −5 | −6 | −6 |
| Spending Under H.R. 2297 ........ | 35,740 | 36,661 | 37,647 | 38,765 | 39,924 | 41,067 | 42,125 | 43,232 | 44,318 | 45,422 | 46,547 |
| **VETERANS' READJUSTMENT BENEFITS** | | | | | | | | | | | |
| Spending Under Current Law .... | 2,305 | 2,575 | 2,749 | 2,923 | 3,100 | 3,259 | 3,406 | 3,543 | 3,696 | 3,820 | 3,947 |
| Proposed Changes .................... | 0 | 6 | 7 | 7 | 7 | 8 | 9 | 9 | 9 | 9 | 9 |
| Spending Under H.R. 2297 ........ | 2,305 | 2,581 | 2,756 | 2,930 | 3,107 | 3,267 | 3,415 | 3,552 | 3,705 | 3,829 | 3,956 |
| **Total Proposed Changes ......** | **0** | **−63** | **−15** | **−18** | **−20** | **−21** | **−22** | **−27** | **−29** | **−44** | **−46** |

[a] Five- and 10-year costs in the text differ slightly from a summation of the annual costs shown here because of rounding.

REINSTATEMENT OF VENDEE HOME LOAN PROGRAM. Section 15 would reinstate the vendee home loan program which was discontinued by the Department of Veterans Affairs (VA) on January 31, 2003. Before that date, when a veteran defaulted on his mortgage and the home went into foreclosure, VA often acquired the property and issued a new direct loan when the property was sold. These loans are called vendee loans. CBO estimates that reinstating the program would save VA $357 million over the 2004–2013 period, or roughly $35 million a year. The bill also would require VA to finance between 50 percent and 85 percent of such sales through the vendee loan program. Before the program was terminated, VA financed roughly 60 percent of such sales with vendee financing and CBO estimates that it would continue to do so under the bill. The estimated savings for this provision is the net effect of three individual program effects (two with savings and one with costs), as explained below.

Based on historical data, CBO estimates that under the bill roughly 14,000 vendee loans would be made each year with an average loan amount of $98,000. Vendee loans lower the subsidy cost of the VA home loan program in two ways. First, VA receives more money for homes sold with vendee financing than those sold with other financing (16 percent more in 2002). Since the proceeds from these home sales are considered recoveries of losses from the guaranteed loans that were foreclosed, enacting this section would increase recoveries and therefore lower subsidy costs in the guaranteed loan portfolio. CBO estimates that VA would save an average of $68 million a year in guaranteed loan subsidies over the 2004–2013 period. Second, because vendee loans have lower prepayment and default rates than other direct loans made by VA, this provision also would lower subsidy costs for direct loans by an average

of $28 million a year over the 2004–2013 period. Finally, before the program was terminated in 2003, VA sold most vendee loans on the secondary mortgage market and guaranteed their timely repayment; CBO estimates that it would continue to do so under the bill. Based on historical data, CBO estimates that VA would sell an average of $1.2 billion in vendee loans annually, at a subsidy cost of roughly $60 million a year.

CHANGES IN LOAN FEES. Section 14 would make several significant changes to the fees charged for the VA home loan guarantee. First, it would require VA to charge the same fees for loans to veterans of active-duty and selected-reserve service; under current law veterans who served in the selected reserves pay 75 basis points more than veterans with active-duty service. Second, starting in 2004, the bill would increase the fee charged for loans made with no downpayment by 15 basis points. Third, the provision would increase the fee charged for repeated use of the home loan benefit (when a veteran uses the benefit more than once) by 30 basis points for the 2004–2011 period and by 90 basis points in 2012 and 2013. Finally, it would replace the existing range of fees for hybrid adjustable rate mortgages with a flat fee of 1.25 percent. CBO estimates that revising fees in the manner specified above would reduce direct spending by $29 million in 2004 and $492 million over the 2004–2013 period.

HOME LOANS FOR RESERVISTS. Section 13 would permanently extend the home loan benefits guaranteed by VA to members of the selected reserve. Under current law, reservists are eligible for home loans guaranteed by VA through 2009. CBO estimates that under the bill, VA would guarantee 9,000 additional loans a year over the 2010–2013 period, with an average loan amount of $153,000. CBO further estimates that the subsidy cost associated with these additional loans would total $10 million over the 2010–2013 period.

*Direct Spending—Compensation, Pensions, and Burial Benefits*

Several sections of the bill would affect spending for veterans' disability compensation, pensions, and burial benefits (see Table 3). Together, those provisions would increase spending by $27 million in 2004, $218 million over the 2004–2008 period and by $479 million over the 2004–2013 period, CBO estimates.

TABLE 3. ESTIMATED CHANGES IN DIRECT SPENDING FOR VETERANS' COMPENSATION, PENSIONS, AND BURIAL BENEFITS UNDER H.R. 2297

| Description of Provisions | By Fiscal Year, in Millions of Dollars | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| **CHANGES IN DIRECT SPENDING** | | | | | | | | | | |
| Retention of DIC for Remarried Spouses | 23 | 40 | 41 | 42 | 43 | 44 | 46 | 47 | 48 | 49 |
| Disability Benefits for Filipino Veterans | 4 | 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 |
| Vocational Training for Pensioners | [1] | 1 | 2 | 2 | 2 | 2 | 0 | 0 | −1 | −1 |
| Spina Bifida Benefits | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] |
| Disability Benefits for Former POWs | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] |
| Burial Benefits for New Philippine Scouts | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] |
| Forfeiture of Benefits for Subversive Activities | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] |
| Total Changes in Compensation, Pensions, and Burial Benefits | 27 | 45 | 47 | 48 | 49 | 50 | 51 | 52 | 52 | 53 |

NOTE: DIC = Death and Indemnity Compensation; POWs = Prisoners of War.

[1] = Less than $500,000.

RETENTION OF DEATH AND INDEMNITY COMPENSATION (DIC) FOR REMARRIED SPOUSES. Under current law, VA provides DIC payments to the surviving spouse of certain deceased veterans. If a surviving spouse remarries, DIC payments cease. Should the subsequent marriage end, either due to divorce or death of the new spouse, DIC payments can resume. Section 6 would allow a surviving spouse who remarries after age 55 to continue receiving DIC payments. The provision would apply retroactively, allowing surviving spouses who have already remarried after age 55 to resume receiving DIC payments but only if they apply for the benefit within one year after this bill is enacted. CBO estimates that the total cost to provide DIC payments to surviving spouses who remarry after age 55 would be $23 million in 2004, $189 million over the 2004–2008 period, and $423 million over the 2004–2013 period. Some of these costs would be offset by direct spending savings in retirement programs for the uniformed services. Those savings are discussed in the section titled "Military Retirement" below.

In fiscal year 2002, about 300,000 surviving spouses received DIC payments. CBO estimates that in that year, about 330 surviving spouses over age 55 (or about 0.1 percent of all surviving spouses receiving DIC) remarried and stopped receiving DIC payments as a result. CBO projects that, under current law, the number of remarriages would gradually increase each year as the overall population of DIC recipients increases and exceed 400 a year by the end of the decade.

CBO estimated the costs for three groups of surviving spouses-those over age 55 who would remarry under current law, those over age 55 who would choose not to remarry under current law but would remarry if section 6 were enacted, and those who remarried after age 55 before enactment of this bill.

*Surviving Spouses Over Age 55 Who Would Remarry Under Current Law.*—CBO estimates that over the 2004–2013 period, about 380 surviving spouses over age 55 would remarry each year on average under current law. Under this bill, federal spending for DIC would increase because those surviving spouses would now receive DIC payments that would have stopped under current law. The average DIC payment in fiscal year 2002 was $12,244. Such pay-

ments are adjusted annually for increases in the cost of living. After accounting for expected mortality of the remarried surviving spouses as well as their new spouses, CBO estimates that the additional cost to provide DIC payments to surviving spouses over age 55 who would remarry under current law would be $7 million in 2004, $69 million over the 2004–2008 period, and $227 million over the 2003–2012 period.

*Surviving Spouses Over Age 55 Who Would Choose Not to Remarry Under Current Law.*—Under this bill, some surviving spouses over age 55 might choose to remarry who would not have done so under current law. CBO estimates there would be no additional cost to provide DIC payments to those individuals. Because those surviving spouses would choose to remain unmarried and receive DIC payments continuously under current law, providing DIC payments if they remarry would result in no additional costs to the program.

*Surviving Spouses Who Remarried After Age 55 Before Enactment of the Bill.*—Section 6 also would apply retroactively, allowing surviving spouses who remarried after age 55 before enactment of this legislation to resume receiving DIC once this legislation was enacted. The bill would impose a deadline, however, that would require all those eligible to apply for resumption this benefit within one year after the bill's enactment date. After accounting for expected mortality of the remarried surviving spouses as well as their new spouses, CBO estimates that about 2,500 surviving spouses who remarried after age 55 would apply within the time limit and resume receiving DIC payments. That number represents about 30 percent of the total number of retroactive cases that CBO estimates would be eligible to reapply for DIC payments. CBO estimates that the additional cost to provide DIC payments to this population would be $16 million in 2004, $120 million over the 2004–2008 period, and $196 million over the 2004–2013 period. Such costs could obviously be much higher or lower, depending on the portion of eligible people that apply for this retroactive benefit. (CBO also estimates that implementing this section would increase spending subject to appropriation by about less than $100,000 a year over the 2004–2006 period, assuming appropriation of the estimates amounts. CBO's estimate of those costs is discussed below under the heading of "Spending Subject to Appropriation.")

DISABILITY BENEFITS FOR FILIPINO VETERANS. Section 16 would expand benefits for Filipino veterans who served in the Philippine Commonwealth Army and the New Philippine Scouts and their survivors. In sum, CBO estimates that enacting section 16 would cost $4 million in 2004, $20 million over the 2004–2008 period, and $44 million over the 2004–2013 period.

*Dependency and Indemnity Compensation.*—Under current law, surviving spouses and dependents of Filipino veterans who served in the Philippine Commonwealth Army or the New Philippine Scouts during World War II and live in the United States are eligible to receive half the amount of the DIC payment that survivors of veterans of the U.S. armed forces receive. Section 16 of the bill would require that these survivors be paid at the full DIC rate.

Based on information provided by VA, CBO estimates that about 420 survivors of Filipino veterans who served in the Philippine

Commonwealth Army or the New Philippine Scouts currently receive DIC payments at the 50 percent rate and that about 120 additional survivors would become eligible for these payments over the 2004–2013 period. CBO assumes that the survivors of these Filipino veterans received about half of the average DIC payment in fiscal year 2002 ($12,244, as noted above). After adjusting for cost-of-living increases, CBO estimates that, under the bill, the average DIC payment to these survivors would be $15,157 for 2004, an increase of $7,578. After accounting for the expected mortality of these veterans and their eligible survivors, CBO estimates that enacting this provision would raise direct spending for DIC by about $3 million in 2004, $18 million over the 2004–2008 period, and about $40 million over the 2004–2013 period.

*Disability Compensation Benefits.*—Under current law, former New Philippine Scouts residing in the United States are eligible to receive half the amount of disability compensation currently available to veterans of the U.S. armed forces. Section 16 would increase disability compensation for these veterans to the full rate. Based on information provided by VA, CBO estimates that there are currently about 100 former New Philippine Scouts residing in the United States today. In fiscal year 2002, the average disability compensation payment was $7,334. CBO assumes that eligible former New Philippine Scouts received about half that amount. After adjusting for cost-of-living increases, CBO estimates that the average disability compensation payment to these veterans would total $8,531 for fiscal year 2004, an increase of $4,265. After accounting for expected mortality rates, CBO estimates that enacting this provision would increase direct spending for veterans' disability compensation by less than $500,000 in 2004, about $2 million over the 2004–2008 period, and about $3 million over the 2004–2013 period.

VOCATIONAL TRAINING FOR PENSIONERS. Low-income veterans who served in the armed forces during a period of war and who are age 65 or older or are determined by VA to be permanently and totally disabled are eligible for monetary support to bring their total income up to a level set by the Congress. Under current law, veterans whose income subsequently exceeds this level are no longer eligible for this pension or the related health care benefits. Section 9 would reinstate a pilot program that offered vocational training and job placement services to certain pension recipients. That program expired in 1995. Under that program, trainees who subsequently became employed were allowed to maintain eligibility for the pension program through their first year of employment and to receive health care benefits for three years after that. Payments for education, training, and other services were made from the pension account. Section 9 would reinstate this program for five years from the bill's date of enactment.

The temporary program of Vocational Training For Certain Pension Recipients operated from February 1, 1985, to December 31, 1995. VA reports that individuals trained under that program from 1985 through 2000. Based on our analysis of that program's history, CBO expects about 50 pensioners to begin training in 2004, increasing to about 250 trainees a year when the program is fully

implemented. The number of trainees would decline after 2008, when the program would stop taking new entrants.

The vocational training and job placement services would be offered under the VA program of Training and Rehabilitation for Veterans with Service-Connected Disabilities. The average benefit under this program was about $7,300 in 2002 and CBO estimates the average benefit will increase to almost $8,100 in 2004. Trainees under the pilot program for pension recipients would generally be eligible for 24 months of vocational training, but would not receive the subsistence allowance and related loans usually available to those in the Training and Rehabilitation program, nor would they be eligible for automobile adaptive equipment.

During the earlier pilot program, the average cost for evaluating and training pension recipients was about 60 percent of the average training and allowance benefit under the Training and Rehabilitation Program, and for this estimate, CBO assumes that will continue to be the case. Thus, CBO estimates that reinstating the pilot program would result in training costs for pension recipients of less than $500,000 in 2004, $7 million over the 2004–2008 period and $12 million over the 2004–2013 period.

To the extent that the trainees are successful in obtaining employment, their pensions would be reduced or eliminated, thereby reducing pension outlays. Assuming similar rates of employment to those reported under the previous pilot, CBO estimates that about 130 pensioners would have their pensions reduced or eliminated for a savings of $5 million over the 2006–2013 period. In total, the pilot program would increase pension costs by less than $500,000 in 2004, $7 million over the 2004–2008 period, and $7 million over the 2004–2013 period.

SPINA BIFIDA BENEFITS. Exposure to certain herbicides used by the Department of Defense (DoD) during the Vietnam War from 1962 to 1971 has been associated with a range of diseases from cancer to birth defects. Under current law, children with spina bifida who were born to veterans of the Vietnam War are entitled to monetary allowances, vocational rehabilitation benefits, and medical benefits administered by VA. Section 12 would expand eligibility for these benefits to children with spina bifida who were born to veterans who served in the demilitarized zone (DMZ) in the Republic of Korea between October 1967 and May 1975.

According to DoD, herbicides were used in the DMZ in Korea in 1968 and 1969. DoD estimates that up to 78,000 veterans may have served in the demilitarized zone during that time period, but that the number of veterans exposed could be much lower.

According to VA, under current law the department provides benefits to about 1,100 children born to Vietnam veterans out of a total of about 3.1 million veterans who served within the borders of Vietnam. In 2002, the costs of benefits provided by VA to children with spina bifida born to Vietnam veterans ranged, depending on the severity of the disease, from $2,736 to $16,248 a year per child for disability compensation and, on average, about $11,300 a year per child for medical benefits.

Based on VA's experience with benefits for children with spina bifida born to Vietnam veterans, CBO estimates that less than 30 children with spina bifida born to veterans who served in the DMZ