Let me also point out that provision, just like the whole bill which is backed by virtually every veteran service organization in the country-that particular provision-on veterans' businesses has 36 military and veterans organizations backing it from a broad spectrum. From the largest Hispanic organization to the Black Veterans for Social Justice, we have a good cross-spectrum of people backing this provision because our veterans who have served so ably and are disabled are absolutely deserving of this legislation.

I thank the gentleman from Arizona (Mr. Renzi) for his leadership on this particular provision. He actually introduced the bill which is incorporated here in our final product. Mr. RENZI has been a champion of veterans benefits, and I thank him.

Mr. Speaker, I also thank Senator

Rockefeller, who was instrumental in encouraging a strong text for this provision. I also thank our counterparts in the Senate, Senator

Graham and the chairman of the Committee on Veterans' Affairs, Senator

Specter, for their work on this legislation and their spirit of cooperation.

Mr. Speaker, I include for the RECORD a joint explanatory statement describing all of the provisions including the compromise agreement that we have reached with the other body.

***H11716** EXPLANATORY STATEMENT ON SENATE AMENDMENT TO HOUSE BILL, H.R. 2297, AS AMENDED

H.R. 2297, as amended, the Veterans Benefits Act of 2003, reflects a Compromise Agreement reached by the House and Senate Committees on Veterans' Affairs ("the Committees") on the following bills considered in the House and Senate during the 108th Congress: H.R. 1257; H.R. 1460, as amended; H.R. 2297, as amended ("House Bill"); and S. 1132, as amended ("Senate Bill"). H.R. 1257 passed the House on May 22, 2003; H.R. 1460, as amended, passed the House on June 24, 2003; H.R. 2297, as amended, passed the House on October 8, 2003; S. 1132, as amended, passed the Senate on October 31, 2003.

The House and Senate Committees on Veterans' Affairs have prepared the following explanation of H.R. 2297, as amended ("Compromise Agreement"). Differences between the provisions contained in the Compromise Agreement and the related provisions of H.R. 1257, H.R. 1460, as amended, H.R. 2297, as amended, and S. 1132, as amended, are noted in this document, except for clerical corrections, conforming changes made necessary by the Compromise Agreement, and minor drafting, technical, and clarifying changes.

TITLE I: SURVIVOR BENEFITS

RETENTION OF CERTAIN VETERANS SURVIVOR BENEFITS FOR SURVIVING SPOUSES REMARRYING AFTER AGE 57

Current Law

(c) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 103(d) of title 38, United States Code, prohibits a surviving spouse who has remarried from receiving dependency and indemnity compensation ("DIC") and related housing and education benefits during the course of the remarriage. This benefit may be reinstated in the event the subsequent marriage is terminated. Public Law 107-330 extended to surviving spouses who remarry after age 55 continuing eligibility under the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA").

House Bill

Section 6 of H.R. 2297, as amended, would allow a surviving spouse who remarries after attaining age 55 to retain the DIC benefit. Spouses who remarry at age 55 or older prior to enactment of the bill would have one year from the date of enactment to apply for reinstatement of DIC benefits. The amount of DIC would be paid with no reduction of certain other Federal benefits to which the surviving spouse might be entitled.

Senate Bill

The Senate Bill contains no comparable provision.

Compromise Agreement

Section 101 of the Compromise Agreement would provide that a surviving spouse upon remarriage after attaining age 57 would retain DIC, home loan, and educational benefits eligibility. Surviving spouses who remarried after attaining age 57 prior to enactment of the Compromise Agreement would have one year to apply for reinstatement of these benefits.

BENEFITS FOR CHILDREN WITH SPINA BIFIDA OF VETERANS OF CERTAIN SERVICE IN KOREA

Current Law

Chapter 18 of title 38, United States Code, authorizes the Department of Veterans Affairs ("VA") to provide benefits and services to those children born with spina bifida whose natural parent (before the child was conceived) served in the Republic of Vietnam between January 9, 1962 and May 7, 1975. Benefits and services are authorized due to the association between exposure to dioxin and the incidence of spina bifida in the children of those exposed. Children born with spina bifida whose parent was exposed to dioxin and other herbicides during military service in locations other than the Republic of Vietnam do not qualify for VA benefits and services.

House Bill

Section 12 of H.R. 2297, as amended, would permit children born with spina bifida whose parent (before the child was conceived) served in an area of Korea near the demilitarized zone ("DMZ") between October 1, 1967 and May 7, 1975, to qualify for benefits in the same manner as children whose parent served in the Republic of Vietnam.

(c) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# House Armed Services Committee

**Ike Skelton**, Chairman
**http://armedservices.house.gov**
**For Immediate Release: May 9, 2007**
**Contact:** Loren Dealy or Lara Battles
202-225-2539

## HOUSE ARMED SERVICES COMMITTEE APPPROVES FISCAL YEAR 2008 DEFENSE AUTHORIZATION BILL

***Restoring Military Readiness and Taking Care of the Troops Are Top Priorities***

***Washington, DC – House Armed Services Committee Chairman Ike Skelton (D-MO) announced that H.R. 1585, the National Defense Authorization Act for Fiscal Year 2008, was reported favorably by the committee on a vote of 58 to 0.***

H.R. 1585 authorizes $506.7 billion in budget authority for the Department of Defense (DoD) and the national security programs of the Department of Energy (DoE). The bill also authorizes $141.8 billion to support ongoing military operations in Iraq and Afghanistan during fiscal year 2008.

In a statement released after the committee's approval of the defense authorization bill, Skelton discussed some of the bill's most significant provisions:

"This year's defense authorization bill concentrates on our military's critical readiness needs by setting priorities that will support our troops in the field, enable our nation to meet immediate military requirements, and preserve our ability to deter and respond to future threats.

"After more than five years at war, the strain of ongoing operations has taken a substantial toll on our military. Continued reports on the state of readiness for our ground forces, particularly our non-deployed and next-to-deploy forces, are of deep concern. With long term deployments in harsh environments wearing out military equipment at an accelerated rate, many stateside units are not fully equipped and would not be considered ready if called upon to respond during an emergency. Lack of equipment and the high tempo of operations have forced the services to train only for immediate mission requirements, shortchanging training for other types of threats.

"In spite of being a nation at war, the United States has not fully mobilized to respond to the needs of our military to meet the current mission and to maintain U.S. military readiness. To tackle this problem, the bill creates a Defense Readiness Production Board to identify critical readiness requirements, monitor and assess industrial capacity, and serve as a focal point for Congress and the Secretary of Defense on readiness issues. Once critical readiness requirements are identified, the services will have access to a $1 billion Strategic Readiness Fund and the Department of Defense will have new procurement authorities to rapidly attend to these pressing needs.

"Further initiatives in the bill to restore readiness and reduce our strategic risk include the authorization of $13.6 billion for the Army and $8.2 billion for the Marine Corps to address equipment reset requirements, $1 billion for National Guard and Reserve equipment from their unfunded requirements list, and $250 million to address training shortfalls throughout the services. Another provision requires the Department of Defense to share its plans on reconstituting our prepositioned war stocks, which have been seriously depleted.

"For our troops in the field and in harm's way, the bill dedicates substantial resources to improve protection, including an additional $4.1 billion for Mine Resistant Ambush Protected (MRAP) Vehicles, which have been found to dramatically reduce the casualties caused by improvised explosive devices and are the top force protection priority for Operation Iraqi Freedom. Funding is also provided for the purchase of personal body armor and for up-armor humvee production.

"Readiness has also been impacted by repeated deployments that have stretched and strained military personnel, with the Army and Marine Corps under particular stress. In keeping with the committee's long advocacy of the need to boost end strength, this bill authorizes an increase in the size of the military by 36,000 Army troops and by 9,000 Marines, which will help meet our commitments, reduce the strain on the force, as well as bolster readiness.

"As the use of the National Guard has expanded in recent years, there has been increasing concern that the National Guard and Reserves have been called upon to meet an ever expanding range of requirements. Given this trend, the bill gives the National Guard enhanced authorities to fulfill its expanded role in the nation's defense, authorizes a fourth star for the Chief of the National Guard Bureau, and makes the National Guard Bureau a joint activity of the Department of Defense. The bill also requires the Department of Defense to evaluate the preparedness of the National Guard for homeland missions, such as disaster response, rather than only evaluating the Guard's readiness for war time contingencies.

"In order to maintain a strong national defense, our nation must take care of our service members and their families. To this end, the bill provides a 3.5 percent pay raise for all service members, which is .5 percent more than the President's budget request, and extends the authority for the Defense Department to offer bonuses and incentive pay. The bill preserves important health benefits by prohibiting fee increases in TRICARE and the TRICARE pharmacy program for service members and retirees. Provisions also include the Wounded Warrior Assistance Act, which addresses the problems identified at Walter Reed Army Medical Center earlier this year.

"The bill also upholds our strong commitment to those who have served and their families by providing an expansion of the combat-related special compensation for combat-related disabled retirees and by establishing a special survivor indemnity allowance to begin to address the offset to the survivor benefit plan and the dependents' indemnity plan.

"In addition to the emphasis on military readiness and taking care of the troops, the defense authorization bill also includes many notable policy provisions. Furthering the committee's important oversight responsibilities concerning U.S. military operations in Iraq, the

bill requires the Secretary of Defense to submit a detailed report on the implementation of the Joint Campaign Plan for Iraq, on efforts made by the Iraqi government to achieve political reconciliation, and on the metrics being used to measure American efforts in Iraq, including the implications for U.S. force levels there. This report will be based upon the assessments of the U.S. Commander in Iraq, General David Petraeus, and the U.S. Ambassador in Iraq, Ryan Crocker, and will enable the committee to ask tough questions and make frank judgments.

"With regard to U.S. military operations in Afghanistan, the bill requires the Secretary of Defense to produce a comprehensive report that outlines the strategic direction of U.S. activities in Afghanistan and includes concrete performance indicators and measures of progress. While providing funds for the Afghan National Security Forces, the bill also calls for a long-term sustainment plan to build the logistics and other capabilities Afghanistan needs for long-term security. To ensure even greater accountability, the bill establishes a new Special Inspector General for Afghanistan Reconstruction and expands the jurisdiction of the Special Inspector General for Iraq Reconstruction.

"Efforts to prevent the spread of nuclear weapons and materials are critical to our security, and this year's bill recognizes this by increasing funding to strengthen and expand the Department of Energy National Nuclear Security Administration's non-proliferation programs and the Department of Defense's Cooperative Threat Reduction (CTR) Program.

"Finally, this bill calls for the Secretary of Defense to undertake a basic look at the Department's roles and missions. A similar effort was undertaken in 1947, which helped to shape the Pentagon through the National Security Act. It is time once again to analyze Department's role and missions, identify the services' core competencies, and examine possible duplication of effort among the branches.

"Members of the House Armed Services Committee have worked very hard on this defense bill and deserve to be proud of the resulting legislation. I want to thank every member of the committee for their efforts to make this the best bill possible for our military and for our nation. I am grateful for the opportunity to serve as chairman and I hope to continue this committee's tradition of bipartisan cooperation as we fulfill our Constitutional obligation to raise and support the U.S. Armed Forces."

A detailed summary of H.R. 1585 as reported by the House Armed Services Committee is available at http://armedservices.house.gov/ .

###

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

May 16, 2007
(House)

# STATEMENT OF ADMINISTRATION POLICY

**H.R. 1585 – National Defense Authorization Act for Fiscal Year 2008**
(Reps. Skelton (D) MO and Hunter (R) CA)

The Administration appreciates the House Armed Services Committee's continued strong support of our national defense. However, the Administration has a number of significant concerns with H.R. 1585, which the Administration looks forward to addressing with Congress as the bill moves through the legislative process.

Modifications to the National Security Personnel System: The Administration strongly opposes section 1106, which would significantly change the National Security Personnel System (NSPS). These changes eviscerate our effort to make civilians equal partners in a Department at war by removing most NSPS flexibilities and completely revoking the adverse actions, appeals, and labor relations portions of NSPS. They also back away from pay for performance. The Department of Defense's (DoD) phased approach to implementation is designed to allow DoD to assess and make periodic enhancements to ensure the system is achieving its goals. DoD already has made some adjustments based on employee feedback. Flexibility is needed given the Department's role in preparing for and responding to ever-changing national security threats. By retaining the meet and confer and continuing collaboration provisions, while also requiring establishment of a limited pay for performance system under select chapter 47 procedures and imposing chapter 71 obligations on the Department, the process becomes so administratively burdensome to design and operate that the effect of the bill is in essence a total revocation of the flexibilities Congress granted the Department. If the President is presented a bill that includes such provisions, his senior advisors will recommend that he veto the bill.

Buy American Provisions: The Administration strongly opposes legislative provisions that would undermine the longstanding U.S. policy – repeatedly affirmed by Congress – to open U.S. defense procurements to commercial suppliers and to suppliers from allied and friendly countries that open their defense procurements to U.S. suppliers. Sections 804, 809, 845, and 846 could jeopardize our military readiness when our objective should be to enhance our ability to get the best capability for the warfighter at the best value for the taxpayer. Such provisions would impose unrealistically arduous requirements on commercial suppliers; decrease competition; jeopardize U.S. suppliers' access to our civil-military procurements and to foreign defense markets; increase costs for U.S. taxpayers; and unnecessarily add red tape to the procurement process. If the President is presented a bill that includes such provisions, his senior advisors will recommend that he veto the bill.

Competitive Sourcing: The Administration strongly opposes language that unnecessarily delays, complicates, and restricts use of public-private competition in determining the most efficient performance of critical functions of DoD. The Department has saved taxpayers over $5 billion

as a result of competitions completed between FY2001 - FY2006 and expects these savings to grow to over $9 billion after the completion of all planned competitions initiated in FY 2007. Particularly onerous are the restrictions on the Secretary's ability to effectively balance the use of competition and other management tools in the Military Departments, the creation of uneven protests rights, intrusive data requirements concerning the provision of retirement benefits, and limitations that would be applied across government to marginalize the consideration of quality in determining the best source for the taxpayer.

Building Global Partnerships Act: The Administration encourages the House to adopt the requested Building Global Partnerships Act, recently transmitted to provide critical authorities for Combatant Commanders to address security priorities and support allies, coalition partners, and others in the War on Terror. These proposals seek authorities to enhance partners' capacity for effective operations and develop greater commonality by expanding professional training and education for partner nations.

National Guard Empowerment Act: The Administration strongly opposes sections 1612, 1621, and 1624 and urges their exclusion. These provisions would impinge on the authority of the Secretary of Defense and the Secretaries of the Army and Air Force, and would fundamentally disrupt existing command authority. Section 1612 would effectively specify in law that the National Guard Bureau (NGB) now works for the Secretary of Defense, rather than the Secretaries of the Army and the Air Force; further challenge the Secretaries of the Army and Air Force in exercising their Title 10 responsibilities for their forces; and effectively would place the NGB at a level above the Military Departments. Section 1621 also would raise significant constitutional issues by turning over command and control of Federal forces to a state elected official.

Reserve Montgomery GI Bill Transfer: The Administration strongly opposes section 525, which would move the Reserve Montgomery GI Bill and the Reserve Educational Assistance Program under Title 38. This would remove critical incentive programs for recruiting and retention from the control of the Secretary of Defense and improperly place them with the Secretary of Veterans Affairs. It would also violate the principle of budgeting for the full cost of benefits when they are earned and result in significantly higher costs to the government.

Special Survivor Indemnity Allowance: The Administration opposes section 644, which would pay a monthly special survivor indemnity allowance of $40 from the DoD Military Retirement Fund. The current benefit programs for survivors, DoD's Survivor Benefit Plan (SBP) and Department of Veterans Affairs' Dependency Indemnity Compensation (DIC), provide sufficient benefits and avoid duplication of two complementary federal benefits programs established for the same purpose -- providing a lifetime annuity for the survivor of an active, retired or former servicemember. This offset policy is consistent with private sector benefits. The provision is estimated to cost $27 million in the first year and about $160 million through FY 2013. It appears to be the first step toward eliminating the offset between SBP and DIC; full elimination of this offset would cost the Military Retirement Fund between $6 and $8 billion over 10 years.

Military Pay: The Administration strongly opposes sections 601 and 606. The additional 0.5 percent increase above the President's proposed 3.0 percent across-the-board pay increase is unnecessary. When combined with the overall military benefit package, the President's proposal provides a good quality of life for servicemembers and their families. While we agree military

pay must be kept competitive, the three percent raise, equal to the increase in the Employment Cost Index, will do that. The cost of increasing the FY 2008 military pay raise by an additional 0.5 percent is $265 million in FY 2008 and $7.3 billion from FY 2008 to FY 2013.

Defense Health Program (TRICARE): The Administration is disappointed that the Committee language would not allow DoD to adjust TRICARE health fees and payments for retired military beneficiaries under age 65 and would not allow the implementation of any similar recommendations by the Task Force on the Future of Military Health Care. The Administration's suggested cost adjustments would make high-quality military health care more sustainable in the future by largely capturing the inflation increases that have occurred since cost sharing was first established in 1996. Not allowing the DoD to proceed with these changes will add over $1.86 billion in cost in FY 2008 and $19.28 billion in cost from FY 2008 to FY 2013.

The Administration strongly opposes section 703, which would impose price controls on prescription drugs when they are dispensed to enrollees in TRICARE through community pharmacies. The Administration believes market competition is the most effective way to promote discounts in the community setting. Government price-setting at community pharmacies will eliminate retail competition; it could also have an adverse impact on other markets, which could limit access to life-saving drugs, reduce convenience for beneficiaries, and ultimately increase costs. Drugs dispensed directly by DoD in its hospitals, clinics, and mail order facilities are already purchased at government purchasing schedules and DOD is working to encourage beneficiaries to take advantage of the lowest prescription drug prices available whenever possible.

Conscience Protections for Medical Personnel: The Administration is disappointed the Rules Committee did not accept an amendment for consideration that would have provided appropriate conscience protections to medical personnel affected by changes to the DoD formulary.

Military to Civilian Conversions: The Administration strongly opposes section 704, which would prohibit military to civilian conversions in the medical care system. This will eliminate the flexibility of the Secretary of Defense to use civilian medical personnel for jobs away from the battlefield and at the same time use the converted military billets to enhance the strength of operating units. DoD needs to determine the right mix of its total force to provide increased combat effectiveness critical to winning the Global War on Terror.

Death Gratuity for Federal Civilian Employees: The Administration strongly opposes section 1105, which would amend the Federal Employees' Compensation Act (FECA) to provide an additional $100,000 death benefit for surviving family members of civilian employees who died supporting U.S. forces in a contingency operation. This provision would raise equity concerns by eroding the uniformity of benefits provided by FECA.

Expansion of Combat Related Special Compensation Eligibility: The Administration strongly opposes piecemeal changes to portions of disability compensation contained in section 645. Several commissions and review groups are reconsidering the country's responsibilities to those medically separated prior to completing a full military career and the Administration will consider comprehensive reform once these reviews are completed.

Acquisition Policy: While the Administration supports the underlying interests of section 806,

821, 822, 824, and 843, the Administration urges their deletion because each of these provisions is either duplicative of recently-enacted laws and implementing regulations or would be counterproductive and not of practical help in strengthening the acquisition process. Section 824, in particular, which imposes exhaustive reporting on contract deficiencies, will interfere with agencies' ability to address and resolve contract performance problems in a timely manner. In addition, section 326(b) would impose on the Department's contractors unmanageable and costly reporting requirements with questionable benefit.

Reductions and Requirements for Weapons Systems: A number of provisions negatively impact weapons systems. Selected examples include:

- Future Combat Systems (FCS): The Administration strongly opposes the Committee's $867 million reduction to the FCS program, which would severely impact or stop development of the Army's top, long-term modernization program. It will force the Army to retain its Cold War hardware (developed in the 1970s and fielded in the 1980s) well beyond 2040, preventing our soldiers from fielding the best available equipment in the future.

- Space and Global Position System (GPS): The Administration is concerned about a number of cuts to the position navigation and timing (PNT) programs -- Air Force and Special Operations Command funding for the Integrated Global Positioning System (GPS) test, and the GPS III satellite program. These reductions will cause significant delays in fielding critical new capabilities and force the continued use of aging or obsolete equipment. Assured continuity of key space capabilities for position, navigation, and timing is critically important to DoD and the Nation's civilian economy.

- B-52 Force Reduction: The Administration urges repeal of section 131, which prohibits the reduction of the B-52H fleet to 56 aircraft -- a number sufficient to meet current and future warfighting requirements. Reducing the size of the B-52 fleet will free up critical resources to develop new systems.

- Littoral Combat Ship (LCS): The Administration is concerned about the Committee's $200 million reduction to the Navy's LCS program. The cut will prevent the procurement of two ships in FY 2008 and delay the fielding of this urgent warfighting capability.

- Reliable Replacement Warhead: The Administration urges full funding for the Reliable Replacement Warhead (RRW) Program. The proposed reduction in funding is likely to delay this program, which is designed to develop and deploy safer, more secure, and more reliable weapons to replace aging Cold War-era weapons in the stockpile.

Missile Defense: The Administration strongly opposes the significant reductions (totaling $764 million) for the Missile Defense Agency, particularly the reductions of $160 million for construction of a third European Missile Defense Site and $250 million for the Transformational Airborne Laser Program.

Repeal of Modification to Insurrection Act: The Administration strongly opposes section 1054,

which could be perceived as significantly restricting a congressionally-granted authority for the President to direct the Secretary of Defense to preserve life and property and by limiting the President's authority to call upon the Reserves. Such a result would be detrimental to the President's ability to employ the Armed Forces effectively to respond to the major public emergencies contemplated by the statute.

Unrequested Procurement Funding and Acquisition Restrictions: The Administration opposes the addition of $2.4 billion for 10 additional C-17 aircraft, $1.7 billion for an additional LPD-17 amphibious ship, and $456 million for a T-AKE cargo ship. These and other similar unrequested additions divert funds from higher priority acquisitions.

Military Medical Treatment Facilities: The Administration endorses the goals of Title XIV of H.R. 1585 but believes that this legislation is premature; the Administration continues to oppose a broad one-year moratorium on the initiation of new public-private competitions involving any function at any military medical facility.

Leasing of Foreign-Built Vessels: The Administration opposes this provision, which would limit DoD's ability to competitively lease needed vessels regardless of where they were constructed. All vessels currently under charter for more than six months are U.S.-flagged, U.S.-crewed, and U.S.-owned or leased. Restricting the maximum lease period of foreign built ships would not increase the number of U.S.-built, militarily useful ships.

Naval Base Guam Kilo Wharf Extension: The Administration opposes the House provision to incrementally fund a military construction project in Guam while permitting full funding on other equally costly construction projects. The Administration position is that all military construction projects should be fully funded except for compelling national security reasons.

Study on Global Climate Change: The Administration opposes section 951, which would mandate the inclusion of a study on global climate change in the next National Security Strategy, National Defense Strategy, and Quadrennial Defense Review. This section sets a harmful precedent. The content of these products should not be reflected in law, particularly in a manner that impinges on the flexibility of national security professionals and policy officials to determine the most appropriate subjects for these strategy documents.

Potential Amendments:

Amendments on Iran: The Administration strongly opposes amendments to the bill to restrict the ability of the United States to deal effectively with the threats to regional security posed by the conduct of Iran, including Iran's efforts to develop nuclear weapons. The Administration also notes that provisions of law that purport to direct or prohibit international negotiations, covert action, or use of the armed forces are inconsistent with the Constitution's commitment exclusively to the presidency of the executive power, the function of Commander in Chief, and the authority to conduct the Nation's foreign policy. If the bill were presented to the President with provisions that would prevent the President from protecting America and allied and cooperating nations from threats posed by Iran, the President' senior advisers would recommend that he veto the bill.

Guantanamo-Related Amendments: The Administration opposes amendments that would

micromanage the detention of enemy combatants by the United States in the war on terror. Current laws and treaties already address the subject of enemy combatants and preserve appropriate flexibility for the President as Commander in Chief to conduct the war effectively within the law. If a bill were presented to the President that prevented him from detaining enemy combatants or collecting from them in accordance with current law intelligence on past and future terrorist activities, the President's senior advisers would recommend that he veto the bill.

Constitutional Concerns: H.R. 1585 raises a number of constitutional concerns including ones regarding the President's authority as Commander-in-Chief to supervise the Executive Branch, and to control the disclosure and dissemination of classified information.

Other requested authorities not included in HR 1585:

Flexible Management of Deployments of Members: The Administration is disappointed that the Committee did not include its proposals providing DoD with more flexible tools to manage the deployment and compensation of servicemembers. The proposed changes would allow DoD to balance operational tempo and compensate servicemembers who deploy more frequently or for longer periods than normal.

Aircraft Carriers: The Administration strongly urges Congress to authorize Navy to maintain 10 operational carriers between the decommissioning of USS ENTERPRISE (CVN 65) and the commissioning of USS GERALD R. FORD (CVN 78). The Navy can meet Combatant Commander surge and presence requirements using a 10-carrier fleet during this time with acceptable risk.

Strategic Airlift Capability Partnership in NATO: The Administration strongly supports the initiative providing authority to participate in and transfer C-17 Globemaster III aircraft to the Strategic Airlift Capability Partnership in NATO. This initiative will allow the U.S. to retain use of C-17 aircraft provided to NATO while gaining surge capacity with two additional aircraft; will provide a critical Strategic Airlift Capability to NATO; will promote interoperability; will strengthen our partnerships with Allies; and will enhance C-17 global sustainment capability.

Foreign Currency Fluctuation Adjustments for Family Housing in Korea: The Administration urges the inclusion of this requested authority to update foreign currency fluctuation adjustments for certain housing leases in Korea. The omission of this authority jeopardizes U.S. ability to successfully execute the Yongsan Relocation Plan.

The Administration is ready to work with Congress on a national defense authorization bill that would strengthen the Nation's Defense capabilities and support priorities in the Global War on Terror, so that the President can sign such a bill into law.

* * * * *

which have been paid by the FBI in an expansive letter on November 21, 2001, by DEA, the Drug Enforcement Agency; on June 21, 2006, by FBI field offices around the country, including Tampa, Detroit, and Charlotte, by U.S. attorneys around the country. It has performed with very strategic results. It is important to decentralize operations such as the National Drug Intelligence Center. Everything does not have to be in Washington. It costs about a third to do it in Johnstown as it would in Washington.

When the Senator from Oklahoma says it ought to be in El Paso because all the drugs come from El Paso, that is simply not true. Drugs come into this country from Miami, from New York, from Detroit, from California. They come from everywhere.

It has been in existence for 14 years and is functioning successfully. It is not a minor matter that it has 340 jobs. Johnstown has become accustomed to having this. Johnstown, as is well known historically, has had its tough time with two major floods. It doesn't deserve another flood by having this body saying the office ought to be removed at this time.

I yield to my distinguished colleague from Scranton, PA.

Mr. CASEY. I wish to reiterate much of what Senator SPECTER already said. This center is providing important law enforcement services right now, helping out on international drug trafficking, which helps out in the fight against terrorism.

If we came to this floor every week and talked about what some Government agency said about a particular facility such as this, we would be having these votes all the time. I was the auditor of Pennsylvania. I know a lot about waste, fraud, and abuse. I know how to find it and root it out. But I also know you cannot take one Government agency's word for it. This center is providing an important service right now, in crime fighting, in keeping local law enforcement working with the Federal Government.

It is an important facility in the State of Pennsylvania. There are people there who are working hard in Johnstown, PA. This is a diversion from some other things we have been doing.

This is very important that we support this kind of facility. All the answers do not reside in Washington, DC. There are some people out there who know how to fight crime, some people out there who know how to root out and crack down on drug trafficking.

This center plays that role. I urge my colleagues to vote against this amendment.

Mr. COBURN. Mr. President, how much time do I have remaining?

The PRESIDING OFFICER. There are 3 minutes 11 seconds.

Mr. COBURN. What you did not hear is what is the mission of the NDIC. It has no mission. That is the problem. The agency running this center says it should be closed—for very good reasons. It does not have an international mandate. They have had people fired because they are doing things that are outside of what restricted mission they have.

The one program that works is DOSX, and those people who are functioning with DOSX have to go to wherever the information is, which they are extracting in the investigation. None of that is done in Johnstown. So if they travel, it doesn't matter where they start.

The point is, the people who work there, who have run it, the people who are managing it, and the rest of the Drug Enforcement Agency and the rest of our drug intelligence says it has no mission. It has accomplished very little. I rest my case and would appreciate a vote.

I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second? There appears to be a sufficient second.

The question is on agreeing to the amendment.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Delaware Mr. (BIDEN) the Senator from New York (Mrs. CLINTON), and the Senator from Illinois (Mr. OBAMA) are necessarily absent.

Mr. LOTT. The following Senators are necessarily absent: the Senator from Kansas (Mr. BROWNBACK) and the Senator from Arizona (Mr. MCCAIN).

The PRESIDING OFFICER (Mr. PRYOR). Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 26, nays 69, as follows:

[Rollcall Vote No. 356 Leg.]

YEAS—26

| | | |
|---|---|---|
| Alexander | Dole | Lugar |
| Allard | Ensign | Martinez |
| Barrasso | Enzi | McConnell |
| Bunning | Feingold | Rockefeller |
| Burr | Graham | Sessions |
| Carper | Grassley | Sununu |
| Coburn | Inhofe | Thune |
| Cornyn | Kyl | Vitter |
| DeMint | Lott | |

NAYS—69

| | | |
|---|---|---|
| Akaka | Durbin | Murkowski |
| Baucus | Feinstein | Murray |
| Bayh | Gregg | Nelson (FL) |
| Bennett | Hagel | Nelson (NE) |
| Bingaman | Harkin | Pryor |
| Bond | Hatch | Reed |
| Boxer | Hutchison | Reid |
| Brown | Inouye | Roberts |
| Byrd | Isakson | Salazar |
| Cantwell | Johnson | Sanders |
| Cardin | Kennedy | Schumer |
| Casey | Kerry | Shelby |
| Chambliss | Klobuchar | Smith |
| Cochran | Kohl | Snowe |
| Coleman | Landrieu | Specter |
| Collins | Lautenberg | Stabenow |
| Conrad | Leahy | Stevens |
| Corker | Levin | Tester |
| Craig | Lieberman | Voinovich |
| Crapo | Lincoln | Warner |
| Dodd | McCaskill | Webb |
| Domenici | Menendez | Whitehouse |
| Dorgan | Mikulski | Wyden |

NOT VOTING—5

| | | |
|---|---|---|
| Biden | Clinton | Obama |
| Brownback | McCain | |

The amendment (No. 2196) was rejected.

Mr. LEVIN. Mr. President, I move to reconsider the vote.

Mr. WARNER. Mr. President, I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENT NOS. 2902, 3000, 3041, 3073, 2127, AS MODIFIED; 3088, 2983, 3076, 2991, 2989, 3081, 3078, 3104, 2133, 3077, 2265, AS MODIFIED; 3087, 2954, 2049, 2101, 2261, 2074, 2000, 2161, 2925, 2912, 2066, 2984, AS MODIFIED; 3075, AS MODIFIED; 3089, AS MODIFIED; 3090, 2993, AS MODIFIED; 2872, AS MODIFIED; 2214, AS MODIFIED; 2942, AS MODIFIED, TO AMENDMENT NO. 2011

Mr. LEVIN. Mr. President, I call up the managers' package at the desk. This package has been agreed to in our unanimous consent agreement. This is the package that is referred to in that unanimous consent agreement.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendments were agreed to, as follows:

AMENDMENT NO. 2902

(Purpose: To provide for an enhancement of the utility of the Certificate of Release or Discharge from Active Duty of members of the Armed Forces)

At the end of subtitle H of title V, add the following:

**SEC. 594. ENHANCEMENT OF CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY.**

The Secretary of Defense shall, in consultation with the Secretary of Veterans Affairs, modify the Certificate of Release or Discharge from Active Duty (Department of Defense from DD214) in order to permit a member of the Armed Forces, upon discharge or release from active duty in the Armed Forces, to elect the forwarding of the Certificate to the following:

(1) The Central Office of the Department of Veterans Affairs in Washington, District of Columbia.

(2) The appropriate office of the United States Department of Veterans in the State in which the member will first reside after such discharge or release.

AMENDMENT NO. 3000

(Purpose: To provide for the relocation of the Joint Spectrum Center in Annapolis, Maryland, to Fort Meade. Maryland, and the termination of the existing lease for the Center)

At the end of subtitle D of title XXVIII, add the following:

**SEC. 2842. AUTHORITY TO RELOCATE THE JOINT SPECTRUM CENTER TO FORT MEADE, MARYLAND.**

(a) AUTHORITY TO CARRY OUT RELOCATION AGREEMENT.—If deemed to be in the best interest of national security and to the physical protection of personnel and missions of the Department of Defense, the Secretary of Defense may carry out an agreement to relocate the Joint Spectrum Center, a geographically separated unit of the Defense Information Systems Agency, from Annapolis, Maryland to Fort Meade, Maryland or another military installation, subject to an agreement between the lease holder and the Department of Defense for equitable and appropriate terms to facilitate the relocation.

(b) AUTHORIZATION.—Any facility, road or infrastructure constructed or altered on a military installation as a result of the agreement must be authorized in accordance with section 2802 of title 10, United States Code.

(c) TERMINATION OF EXISTING LEASE.—Upon completion of the relocation of the Joint Spectrum Center, all right, title, and interest of the United States in and to the existing lease for the Joint Spectrum Center shall

under this section may contribute amounts for purposes of receiving an increased amount of educational assistance as provided for in paragraph (2).

"(B) An individual covered by subparagraph (A) may make the contributions authorized by that subparagraph at any time while a member of a reserve component, but not more frequently than monthly.

"(C) The total amount of the contributions made by an individual under subparagraph (A) may not exceed $600. Such contributions shall be made in multiples of $20.

"(D) Contributions under this subsection shall be made to the Secretary concerned. Such Secretary shall deposit any amounts received as contributions under this subsection into the Treasury as miscellaneous receipts.

"(2) Effective as of the first day of the enrollment period following the enrollment period in which an individual makes contributions under paragraph (1), the monthly amount of educational assistance allowance applicable to such individual under this section shall be the monthly rate otherwise provided for under subsection (c) increased by—

"(A) an amount equal to $5 for each $20 contributed by such individual under paragraph (1) for an approved program of education pursued on a full-time basis; or

"(B) an appropriately reduced amount based on the amount so contributed as determined under regulations that the Secretary of Veterans Affairs shall prescribe, for an approved program of education pursued on less than a full-time basis.".

AMENDMENT NO. 2261

(Purpose: To extend the period of entitlement to educational assistance for certain members of the Selected Reserve affected by force shaping initiatives)

At the end of subtitle E of title VI, add the following:

**SEC. 673. EXTENSION OF PERIOD OF ENTITLEMENT TO EDUCATIONAL ASSISTANCE FOR CERTAIN MEMBERS OF THE SELECTED RESERVE AFFECTED BY FORCE SHAPING INITIATIVES.**

Section 16133(b)(1)(B) of title 10, United States Code, is amended by inserting "or the period beginning on October 1, 2007, and ending on September 30, 2014," after "December 31, 2001,".

AMENDMENT NO. 2074

(Purpose: To modify the time limit for use of entitlement to educational assistance for reserve component members supporting contingency operations and other operations)

At the end of subtitle E of title VI, add the following:

**SEC. 673. MODIFICATION OF TIME LIMIT FOR USE OF ENTITLEMENT TO EDUCATIONAL ASSISTANCE FOR RESERVE COMPONENT MEMBERS SUPPORTING CONTINGENCY OPERATIONS AND OTHER OPERATIONS.**

(a) MODIFICATION.—Section 16164(a) of title 10, United States Code, is amended by striking "this chapter while serving—" and all that follows and inserting "this chapter—

"(1) while the member is serving—

"(A) in the Selected Reserve of the Ready Reserve, in the case of a member called or ordered to active service while serving in the Selected Reserve; or

"(B) in the Ready Reserve, in the case of a member ordered to active duty while serving in the Ready Reserve (other than the Selected Reserve); and

"(2) in the case of a person who separates from the Selected Reserve of the Ready Reserve after completion of a period of active service described in section 16163 of this title and completion of a service contract under other than dishonorable conditions, during the 10-year period beginning on the date on which the person separates from the Selected Reserve.".

(b) CONFORMING AMENDMENT.—Paragraph (2) of section 16165(a) of such title is amended to read as follows:

"(2) when the member separates from the Ready Reserve as provided in section 16164(a)(1) of this title, or upon completion of the period provided for in section 16164(a)(2) of this title, as applicable.".

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect on October 28, 2004, as if included in the enactment of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005 (Public Law 108–375), to which such amendments relate.

AMENDMENT NO. 2000

(Purpose: To repeal the requirement for reduction of survivor annuities under the Survivor Benefit Plan by veterans' dependency and indemnity compensation and to modify the date of paid-up coverage under the Survivor Benefit Plan)

At the end of subtitle D of title VI, add the following:

**SEC. 656. REPEAL OF REQUIREMENT OF REDUCTION OF SURVIVOR BENEFIT PLAN SURVIVOR ANNUITIES BY DEPENDENCY AND INDEMNITY COMPENSATION.**

(a) REPEAL.—

(1) IN GENERAL.—Subchapter II of chapter 73 of title 10, United States Code, is amended as follows:

(A) In section 1450, by striking subsection (c).

(B) In section 1451(c)—

(i) by striking paragraph (2); and

(ii) by redesignating paragraphs (3) and (4) as paragraphs (2) and (3), respectively.

(2) CONFORMING AMENDMENTS.—Such subchapter is further amended as follows:

(A) In section 1450—

(i) by striking subsection (e); and

(ii) by striking subsection (k).

(B) In section 1451(g)(1), by striking subparagraph (C).

(C) In section 1452—

(i) in subsection (f)(2), by striking "does not apply—" and all that follows and inserting "does not apply in the case of a deduction made through administrative error."; and

(ii) by striking subsection (g).

(D) In section 1455(c), by striking ", 1450(k)(2),".

(b) PROHIBITION ON RETROACTIVE BENEFITS.—No benefits may be paid to any person for any period before the effective date provided under subsection (f) by reason of the amendments made by subsection (a).

(c) PROHIBITION ON RECOUPMENT OF CERTAIN AMOUNTS PREVIOUSLY REFUNDED TO SBP RECIPIENTS.—A surviving spouse who is or has been in receipt of an annuity under the Survivor Benefit Plan under subchapter II of chapter 73 of title 10, United States Code, that is in effect before the effective date provided under subsection (f) and that is adjusted by reason of the amendments made by subsection (a) and who has received a refund of retired pay under section 1450(e) of title 10, United States Code, shall not be required to repay such refund to the United States.

(d) REPEAL OF AUTHORITY FOR OPTIONAL ANNUITY FOR DEPENDENT CHILDREN.—Section 1448(d)(2) of such title is amended—

(1) by striking "DEPENDENT CHILDREN.—" and all that follows through "In the case of a member described in paragraph (1)," and inserting "DEPENDENT CHILDREN.—In the case of a member described in paragraph (1),"; and

(2) by striking subparagraph (B).

(e) RESTORATION OF ELIGIBILITY FOR PREVIOUSLY ELIGIBLE SPOUSES.—The Secretary of the military department concerned shall restore annuity eligibility to any eligible surviving spouse who, in consultation with the Secretary, previously elected to transfer payment of such annuity to a surviving child or children under the provisions of section 1448(d)(2)(B) of title 10, United States Code, as in effect on the day before the effective date provided under subsection (f). Such eligibility shall be restored whether or not payment to such child or children subsequently was terminated due to loss of dependent status or death. For the purposes of this subsection, an eligible spouse includes a spouse who was previously eligible for payment of such annuity and is not remarried, or remarried after having attained age 55, or whose second or subsequent marriage has been terminated by death, divorce or annulment.

(f) EFFECTIVE DATE.—The sections and the amendments made by this section shall take effect on the later of—

(1) the first day of the first month that begins after the date of the enactment of this Act; or

(2) the first day of the fiscal year that begins in the calendar year in which this Act is enacted.

**SEC. 657. EFFECTIVE DATE OF PAID-UP COVERAGE UNDER SURVIVOR BENEFIT PLAN.**

(a) SURVIVOR BENEFIT PLAN.—Section 1452(j) of title 10, United States Code, is amended by striking "October 1, 2008" and inserting "October 1, 2007".

(b) RETIRED SERVICEMAN'S FAMILY PROTECTION PLAN.—Section 1436a of such title is amended by striking "October 1, 2008" and inserting "October 1, 2007".

AMENDMENT NO. 2161

(Purpose: To repeal the annual limit on the number of Reserve Officers' Training Corps scholarships under the Army Reserve and Army National Guard financial assistance program)

At the end of subtitle D of title V, add the following:

**SEC. 555. REPEAL OF ANNUAL LIMIT ON NUMBER OF ROTC SCHOLARSHIPS UNDER ARMY RESERVE AND ARMY NATIONAL GUARD FINANCIAL ASSISTANCE PROGRAM.**

Section 2107a(h) of title 10, United States Code, is amended by striking "not more than 416 cadets each year under this section, to include" and inserting "each year under this section".

AMENDMENT NO. 2925

(Purpose: To provide that veterans with service-connected disabilities rated as total by virtue of unemployability shall be covered by the termination of the phase-in of concurrent receipt of retired pay and veterans disability compensation for military retirees).

At the end of subtitle D of title VI, insert the following:

**SEC. 656. INCLUSION OF VETERANS WITH SERVICE-CONNECTED DISABILITIES RATED AS TOTAL BY REASON OF UNEMPLOYABILITY UNDER TERMINATION OF PHASE-IN OF CONCURRENT RECEIPT OF RETIRED PAY AND VETERANS' DISABILITY COMPENSATION.**

(a) INCLUSION OF VETERANS.—Section 1414(a)(1) of title 10, United States Code, is amended by striking "except that" and all that follows and inserting "except that payment of retired pay is subject to subsection (c) only during the period beginning on January 1, 2004, and ending on December 31, 2004, in the case of the following:

"(A) A qualified retiree receiving veterans' disability compensation for a disability rated as 100 percent.

"(B) A qualified retiree receiving veterans' disability compensation at the rate payable